**CITY OF SAN ANTONIO, Petitioner,**

v.

**Charles POLLOCK and Tracy Pollock, individually and as next friends of Sarah Jane Pollock, a Minor Child, Respondents.**

**No. 04–1118.**

Supreme Court of Texas.

Argued Oct. 18, 2006.

Decided May 1, 2009.

Rehearing Denied June 26, 2009.

---

Sharon E. Callaway, Crofts & Callaway, P.C., Nissa M. Dunn, Law Offices of Nissa Dunn, P.C., San Antonio, TX, Pamela Stanton Baron, Attorney At Law, Austin, Andrew F. Martin, Office of City Attorney, Gail A. Jensen, Amy Eubanks Perkins, City Attorney's Office, Martha Guadiana Sepeda, City of San Antonio Litigation Div., Michael D. Bernard, Asst. City Atty., Jack Pasqual, Office of City Atty., San Antonio, TX, for Petitioner.

Sylvan S. Lang Jr., Lang Law Firm, PC, Susan G. Gray, Law Office of Susan Gray, Jennifer Beldon Rosenblatt, The Rosenblatt Law Firm, Cathy J. Sheehan, Office of City Atty., Litigation Div., Laura A. Cavaretta, Richard Copeland, Plunkett & Gibson, Inc., Gilbert Vara Jr., The Law Office of Gilbert Vara, Jr., San Antonio, TX, for Respondent.

Kristofer S. Monson, Asst. Solicitor Gen., Austin, TX, for Amicus Curiae.

Justice HECHT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice WAINWRIGHT, Justice JOHNSON and Justice WILLETT joined, and in all but Part II–C of which Justice BRISTER joined.

When the government maintains a public nuisance that it knows is substantially certain to cause a specific injury to private property, it may be required by article I,

section 17 of the Texas Constitution[1] to provide adequate compensation for taking or damaging the property.[2] The claim in this case is that benzene from a closed municipal waste disposal site migrated through the soil to a nearby home, reducing its value and causing the owners' minor daughter to contract leukemia. We hold that there is no evidence the city knew its actions were substantially certain to cause the asserted injuries or that the personal injuries were caused by exposure to benzene. Accordingly, we reverse the judgment of the court of appeals[3] and render judgment for petitioner.

# I

Charles and Tracy Pollock's daughter Sarah was born in June 1994. In February 1998, she was diagnosed with acute lymphoblastic leukemia ("ALL"). Cancer is rare in children, but leukemia is the most common, and ALL is the most common type of childhood leukemia.[4] A bone marrow biopsy also found that sixty percent of Sarah's bone marrow cells had 56 to 58 chromosomes instead of the expected 23 pairs; there were trisomies, a tetrasomy, and a translocation.[5] Following an intensive regimen of chemotherapy lasting more than two years, the cancer went into remission and the chromosomal anomalies disappeared. The statistical chance of recurrence is twenty percent.[6]

After Sarah began treatment, the Pollocks decided their family had outgrown the home in which they had been living in

1. Tex. Const. art. I, § 17 ("No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made....").

2. *City of Dallas v. Jennings*, 142 S.W.3d 310, 314, 316 (Tex.2004) ("We ... hold that when a governmental entity physically damages private property in order to confer a public benefit, that entity may be liable under Article I, Section 17 if it (1) knows that a specific act is causing identifiable harm; or (2) knows that the specific property damage is substantially certain to result from an authorized government action—that is, that the damage is necessarily an incident to, or necessarily a consequential result of the government's action.... [A] city may be held liable for a nuisance that rises to the level of a constitutional taking." (internal quotation marks omitted)).

3. 155 S.W.3d 322 (Tex.App.-San Antonio 2004).

4. Acute lymphoblastic leukemia is also called acute lymphocystic leukemia. The American Cancer Society reported in its publication, Cancer Facts and Figures 2000, at 19 (2000), *available at* http://www.cancer. org/downloads/STT/F & F00.pdf (last visited Nov. 20, 2008): "Leukemia is the most common form of cancer in childhood, affecting approximately 2,600 children under age 15 in the United States each year. Leukemia accounts for about one-third of all cancers in children under age 15 and about one-fourth of all cancers occurring before age 20. Acute lymphoblastic leukemia (ALL) constitutes approximately three-fourths of all childhood leukemias. The peak occurrence of ALL is between ages 2 and 3, with rates slightly higher among whites and males. Five-year relative survival from ALL has greatly increased over time, and is now nearly 80%, primarily due to several improvements in treatment."

5. Normally, each of the 23 pairs of human chromosome consists of two copies of a linear strand of DNA material, one from the father and one from the mother, joined together at a point along their lengths called the centromere in a four-armed shape. A trisomy has three strands instead of a pair, and a tetrasomy has four. In 60% of Sarah's bone marrow cells there were nine trisomies—at pairs 4, 6, 8, 9, 10, 14, 17, 18, and 23—and a tetrasomy—at pair 21. A translocation occurs when part of a chromosome is missing and attached instead to another chromosome. Sarah had a portion of chromosome pair 1 translocated to chromosome pair 22.

6. Sarah also faces an increased risk of developing a secondary cancer as a result of her chemotherapy regimen.

San Antonio since January 1992, before Sarah and her younger sister were born, and they put it up for sale. The home backed up to an old limestone quarry the City had used as a waste disposal site from 1967 to 1972 called the West Avenue landfill. The landfill had been closed and covered over with several feet of dirt twenty years before the Pollocks bought their home, but they had always smelled what Tracy described as "a really strong, pungent odor" in the house, particularly in the bathrooms. They smelled the same odor in the back yard for several days after a rain.

The Pollocks' realtor, wanting to fully disclose the condition of the property to prospective buyers, obtained an April 1998 report prepared for the City on methane gas concentrations around the landfill and gave it to the Pollocks. Anaerobic bacteria digesting landfill waste can produce large quantities of methane. Methane, the principal component of natural gas, is a colorless, odorless gas at room temperature and standard pressure.[7] It has a lower explosive limit of 5% and an upper explosive limit of 15%, which means that it is explosive at a concentration of between 5% and 15% in air. Though not toxic, it can cause asphyxiation at a concentration above 14% in air. Bacterial production of methane increases when leachate is present. Leachate is water that has seeped down into a landfill and percolated through it, collecting various contaminants along the way. Methane can serve as a carrier for other landfill byproducts and volatile organic compounds, such as benzene. Benzene is an aromatic hydrocarbon found in crude oil. At room temperature and standard pressure, benzene is a clear liquid with a sweet smell, but it evaporates quickly and is highly flammable. It is widely used as a gasoline additive, an industrial solvent, and a precursor in the production of other chemicals, and is present in cigarette smoke. Benzene is a known carcinogen.

Attached to the report the realtor obtained was an analysis of gas samples taken at the landfill, reflecting that small traces of benzene had been detected—13.3 ppb in one sample and 146 ppb in another.[8] Tracy showed the report to one of Sarah's oncologists, Dr. Kenneth Lazarus, who became alarmed and warned her to keep her children out of the back yard. The Pollocks immediately moved out of their home and sold it a few months later for $75,000. (They had paid $77,000 for it seven years earlier and were asking $94,000.) In January 2000, the Pollocks sued the City, claiming that Sarah's ALL was caused by Tracy's exposure to benzene from the West Avenue landfill during her pregnancy.

The evidence revealed that several years after the City closed the landfill in 1972, it began receiving complaints from nearby residents about odors caused by gases escaping from the landfill. In 1980, the City found that pockets of methane gas had formed near the landfill, some in potentially explosive concentrations. The highest observed concentrations were along the southwest side of the landfill, in the neighborhood where the home the Pollocks later bought was located. To collect methane from the landfill and prevent its migration

---

7. As a consumer safety measure, a foul-smelling odorant, usually methanethiol or ethanethiol, is added to natural gas sold for fuel.

8. The Texas Commission on Environmental Quality gives these examples to illustrate "ppb"—parts per billion: 1 penny in 10 million dollars; 1 second in 32 years; 1 foot of a trip to the moon; 1 blade of grass on a football field; 1 drop of water in an Olympic-size swimming pool. *See* http://www.tceq. state.tx.us/assets/public/remediation/ superfund/ jonesroad/ppb_chart.pdf (last visited Nov. 20, 2008).

into the surrounding area, the City drilled a system of ventilation wells around the perimeter, connected by a pipe, with a compressor to lower the pressure so that gas would be drawn from the landfill into the wells. The City also purchased two residences near the landfill in which gas had been detected, one just two blocks from the Pollocks' property, to use as monitoring facilities.

In 1982, a survey of the water quality in several wells in the Edwards Aquifer detected various volatile organic compounds, including benzene, which might have come from the landfill. A consulting firm hired by the City concluded that methane was migrating through subsurface cracks in the walls and base of the landfill. Once outside the landfill, methane could also flow through the soil along trenches that had been dug to lay residential utilities, like water and sewer lines, and refilled. In that way, methane carrying benzene and other chemicals could migrate to the houses surrounding the landfill, endangering residents. The consultants also concluded that leachate had accumulated in the landfill, increasing methane production and blocking it from reaching the ventilation wells. The consultants recommended that the methane collection system be improved and wells drilled to remove leachate from the landfill.

The City made several improvements in 1985, but subsidence in the landfill continued to impair operation of the methane collection system and the leachate collection wells, causing portions of the system to collapse. Subsidence also allowed water to pool at the surface, increasing drainage through the landfill and the amount of leachate, which in turn increased methane production. When the Pollocks bought their home, there was a large hole in the back yard, apparently due to subsidence near the landfill. At the Pollocks' request,

the City filled the hole, but it developed again later, and the City filled it a second time.

In late 1989, a City engineer recommended major repairs to the methane collection system, and in August 1994, an outside contractor hired by the City recommended that the entire system be replaced. The City installed a new system in early 1998.

Over the years, the City regularly tested for landfill gas in the ventilation wells and at several homes near the landfill, including those used as monitoring facilities. The air near the Pollocks' home was field-tested for methane at various times between 1981 and 1997, using a hand-held explosimeter. No methane was detected near the Pollocks' home while they lived there. At trial, the Pollocks' expert, Dan Kraft, an engineer with experience in landfill management, attempted to extrapolate the presence of landfill gas on the Pollocks' property in 1993 and 1994, when Tracy was pregnant with Sarah, from samples taken in 1998 from a sealed monitoring well 128 feet deep, located 30 feet from the Pollocks' back yard and 70 feet from their home. Those samples contained methane at a concentration of 477,000 ppm (47.7%) and benzene at 146 ppb by volume. Assuming that the ratio of benzene to methane remained constant over time while methane from the landfill was decreasing—an assumption the City agreed was reasonable—and using an accepted EPA gas generation model, Kraft concluded that, had a sample from the sealed well been taken in 1993–1994, it would have contained at least 160 ppb benzene. Kraft then stated that in his opinion, gas with a composition similar to the sample entered the Pollocks' home "on a regular basis". Of course, landfill gas would immediately dissipate in the open air.[9] Even greatly

9. Methane is much lighter than air (0.55 specific gravity at standard temperature and

diluted, the gas would have been asphyxiating and explosive. Kraft offered no opinion regarding any concentrations of methane or benzene in the ambient air in the Pollocks' home and yard.

Dr. Mahendar Patel, Sarah's other treating oncologist, testified that in his opinion, Sarah's leukemia was caused by Tracy's exposure to benzene while she was pregnant with Sarah. Patel was experienced in diagnosing and treating ALL but had done no research himself on the causes of the disease or any connection between ALL and benzene. He based his opinion at trial on Kraft's testimony and on several studies of cancer rates in workers occupationally exposed to benzene. None of the studies considered an exposure to benzene at a concentration less than 31 ppm, which is 31,000 ppb, over 200 times the concentration in the 1998 sample on which Kraft relied. The studies also found chromosomal anomalies in subjects, some of which were similar to Sarah's, but the studies did not conclude that exposure to benzene was the most likely cause of anomalies like Sarah's.

Garbage removal and disposal is a governmental function [10] for which the City is immune from liability, but the Pollocks contend that governmental immunity does not bar their recovery for nuisance and negligence. Article I, section 17 of the Texas Constitution requires compensation for a nuisance that amounts to a taking of property,[11] and the Texas Tort Claims Act waives immunity for governmental negli-

gence in some circumstances.[12] The jury found that:

- the landfill was a nuisance;
- the City was negligent;
- the City acted with malice;
- actual damages caused by the nuisance and the negligence were:
 - $7 million for Sarah's past and future physical pain and mental anguish, disfigurement, and physical impairment;
 - $111,000 for past medical care; and
 - $6 million for future medical care;
- property damages caused by the nuisance was $29,000; and
- $10 million exemplary damages should be assessed against the City.

The Pollocks elected to recover on their nuisance claim. The trial court reduced the award for future medical expenses to $500,000 and otherwise rendered judgment on the verdict, plus prejudgment interest and costs, for a total of $19,999,223.78. On appeal by the City, the court of appeals reversed the exemplary damage award and affirmed in all other respects.[13]

We granted the City's petition for review.[14]

## II

### A

The Pollocks rest their claim that Sarah's ALL was caused by *in utero* expo-

pressure). Benzene vapor, though heavier than air, is volatile and dissipates rapidly in air. AGENCY FOR TOXIC SUBSTANCES & DISEASE REGISTRY, U.S. DEPT. OF HEALTH & HUMAN SERVS., HEALTH CONSULTATION: REVIEW OF ON-SITE AIR MONITORING DATA DURING THE REMOVAL AT LE MARS COAL GAS SITE 7 (2005).

10. TEX. CIV. PRAC. & REM CODE § 101.0215(a)(6).

11. TEX. CONST. art. I, § 17.

12. TEX. CIV. PRAC. & REM.CODE § 101.021.

13. 155 S.W.3d 322 (Tex.App.-San Antonio 2004).

14. 49 Tex. Sup.Ct. J. 567 (May 5, 2006).

sure to benzene from the West Avenue landfill on the opinions of their experts, Kraft and Patel. The City contends that the expert testimony was conclusory and therefore legally insufficient to support a judgment. The City raised this objection repeatedly in the trial court, in motions for directed verdict after the Pollocks rested their case and again at the close of the evidence, and by post-trial motions for judgment non obstante veredicto and for new trial. But the City did not object to the admission of the evidence.

■ Bare, baseless opinions will not support a judgment even if there is no objection to their admission in evidence. In *Coastal Transportation Co. v. Crown Central Petroleum Corp.*, we summarized settled law as follows:

> [A]lthough expert opinion testimony often provides valuable evidence in a case, "it is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex.1999). Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact "more probable or less probable." *See* TEX.R. EVID. 401. This Court has labeled such testimony as "incompetent evidence," and has often held that such conclusory testimony cannot support a judgment. *Cas. Underwriters v. Rhone*, 134 Tex. 50, 132 S.W.2d 97, 99 (1939) (holding that a witness's statements were "but bare conclusions and therefore incompetent"); *see also Wadewitz v. Montgomery*, 951

S.W.2d 464, 466 (Tex.1997) ("[A]n expert witness's conclusory statement . . . will neither establish good faith at the summary judgment stage nor raise a fact issue to defeat summary judgment."). Furthermore, this Court has held that such conclusory statements cannot support a judgment even when no objection was made to the statements at trial. *Dallas Ry. & Terminal Co. v. Gossett,* 156 Tex. 252, 294 S.W.2d 377, 380 (1956) ("It is well settled that the naked and unsupported opinion or conclusion of a witness does not constitute evidence of probative force and will not support a jury finding even when admitted without objection."); *Rhone,* 132 S.W.2d at 99 (holding that "bare conclusions" did not "amount to any evidence at all," and that "the fact that they were admitted without objection add[ed] nothing to their probative force"); *see also Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 712 (Tex.1997) ("When the expert 'brings to court little more than his credentials and a subjective opinion,' this is not evidence that would support a judgment. . . . If for some reason such testimony were admitted in a trial without objection, would a reviewing court be obliged to accept it as some evidence? The answer is no.").[15]

We held that a party may complain that conclusory opinions are legally insufficient evidence to support a judgment even if the party did not object to the admission of the testimony.[16]

■ When a scientific opinion is not conclusory but the basis offered for it is unreliable, a party who objects may complain that the evidence is legally insuffi-

---

**15.** *Coastal Transp. Co. v. Crown Central Petrol. Corp.,* 136 S.W.3d 227, 232 (Tex.2004) (footnote omitted).

**16.** *Id.* ("We disagree that an objection is needed to preserve a no-evidence challenge to conclusory expert testimony.").

cient to support the judgment.[17] An objection is required to give the proponent a fair opportunity to cure any deficit and thus prevent trial by ambush.[18] As we explained in *Coastal*, there is

> a distinction between challenges to an expert's scientific methodology and no evidence challenges where, on the face of the record, the evidence lacked probative value. When the expert's underlying methodology is challenged, the court necessarily looks beyond what the expert said to evaluate the reliability of the expert's opinion. When the testimony is challenged as conclusory or speculative and therefore non-probative on its face, however, there is no need to go beyond the face of the record to test its reliability. We therefore conclude that when a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis. However, when the challenge is restricted to the face of the record—for example, when expert testimony is speculative or conclusory on its face—then a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility.[19]

In *Coastal*, the plaintiff contended that the defendant was grossly negligent in using a defective device to prevent overfilling gasoline tanker trucks, resulting in a spill and fire.[20] An expert's opinions that the defendant acted with conscious indifference were simple assertions with no basis at all, and we held that they were legally insufficient to support the judgment.[21] But even when some basis is offered for an opinion, if that basis does not, on its face, support the opinion, the opinion is still conclusory. Our decision in *Volkswagen of America, Inc. v. Ramirez*[22] is an example. There, the plaintiff's car bumped against another vehicle traveling the same direction, then crossed a 500–foot grassy median to the opposite side of the highway and hit a third car head-on.[23] The plaintiff's expert concluded that the rear wheel of the plaintiff's car came loose from the axle before the accident rather than after, and therefore caused, rather than was caused by, the accident.[24] The expert pointed to several facts to show that the wheel bearing failed and noted that after the accident, grass was found in the hub of the detached wheel.[25] But he could not explain how the wheel detached before the accident but nevertheless remained in the car's wheel well while the car crossed the median and collided with another car.[26] We concluded that, even assuming the expert's methodology was reliable (the defen-

**17.** *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711–712 (Tex.1997).

**18.** *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex.1998) ("To preserve a complaint that scientific evidence is unreliable and thus, no evidence, a party must object to the evidence before trial or when the evidence is offered. Without requiring a timely objection to the reliability of the scientific evidence, the offering party is not given an opportunity to cure any defect that may exist, and will be subject to trial and appeal by ambush." (citations omitted)).

**19.** *Coastal*, 136 S.W.3d at 233 (citations omitted).

**20.** *Id.* at 230.

**21.** *Id.* at 231, 233.

**22.** 159 S.W.3d 897 (Tex.2004).

**23.** *Id.* at 901–902.

**24.** *Id.* at 902.

**25.** *Id.* at 911.

**26.** *Id.*

dant had not objected to it) and taking the record at face value, the facts on which he relied did not support his conclusion.[27]

■■ When a scientific opinion is admitted in evidence without objection, it may be considered probative evidence even if the basis for the opinion is unreliable. But if no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection. "[A] claim will not stand or fall on the mere *ipse dixit* of a credentialed witness."[28] In the case before us, the Pollocks argue that the City's challenge to their experts' testimony is really a challenge to its reliability—to the data used and the experts' methodology. The City insists that it is not challenging the reliability of Kraft's and Patel's testimony, even conceding that it agrees with much of their methodology. Rather, the City contends that there is no basis in the record for the experts' ultimate opinions, and therefore they cannot support the judgment. We examine each expert in turn and conclude that there was no evidence to support an award of personal injury damages on the Pollocks' theories of nuisance or negligence.

### B

Kraft's testimony was offered to prove that Sarah Pollock was exposed *in utero* to landfill gas at levels high enough to cause ALL. Landfill gas had never been found on the Pollocks' property from the time they lived there to the time of trial, but it had been found in other homes in the neighborhood, and it could have migrated to the Pollock's property along underground utility lines or through the ground

generally. The Pollocks smelled odors in their home and back yard which might have been landfill gas, and subsidence in their back yard might have been due to underground leachate from the landfill. In 1998, gas in a sealed monitoring well 128 feet deep and 30 feet from the Pollocks' property tested 47.7% methane with 146 ppb benzene by volume. Using an EPA-approved gas model, Kraft extrapolated that in 1993–1994, gas in the well would have been more than 50% methane with 160 ppb benzene by volume. Based on this data and analysis, Kraft concluded: the Pollocks were exposed to gas levels like that in the sealed well. In other words, air on the Pollock's property would have been like that found in the sealed well.

The City does not challenge any part of Kraft's analysis except his final conclusion. The City does not quarrel with Kraft's decision to use 1998 gas samples taken from the monitoring well closest to the Pollocks' property, or with his assumptions that the benzene-to-methane ratio was constant over time while methane from the landfill was decreasing, or with his conclusion that therefore the benzene concentration in the well between 1993 and 1994 would have been 160 ppb. The City does not dispute that methane migrated out of the landfill or that it was possible for methane to migrate onto surrounding property, including the Pollocks' property, through utility trenches or otherwise.

■ The City contends that none of these facts or analyses supports Kraft's conclusion that the Pollocks were exposed to benzene at a level of 160 ppb in the air in their home and on their property. Assuming from Kraft's data that in 1993–1994, gas in the monitoring well would

---

27. *Id.*

28. *Burrow v. Arce,* 997 S.W.2d 229, 235 (Tex. 1999).

have been 50% methane and 160 ppb benzene, and that gas of that composition migrated onto the Pollocks' property, it unquestionably dissipated in the ambient air. Unless the landfill gas was less than 28% of the ambient air—and the methane concentration reduced below 14%, with a benzene concentration of 44.8 ppb—the Pollocks would have suffocated *from the methane*. Unless gas like that found in the well were less than 10% of the ambient air—and the methane concentration reduced below 5% methane, with a benzene concentration of 16 ppb—there would almost certainly have been an explosion *from the methane*. There is no evidence whatever from which one could infer the concentration to which Tracy Pollock was exposed in the ambient air of her home and yard, but at the highest concentration possible, the methane—and consequently the level of benzene—could have been only a fraction of that in the sealed monitoring well. Kraft's opinion that she was chronically exposed to benzene concentrations of 160 ppb has no basis in the record. Indeed, it is directly contradicted by his own data showing such concentrations present only in the well. Kraft's opinion is the kind of naked conclusion that cannot support a judgment.

## C

■ The purpose of Patel's testimony was to prove that Tracy Pollock's exposure to benzene concentrations of 160 ppb—assuming Kraft was correct—could cause Sarah's ALL *in utero*. The City does not challenge the reliability of Patel's data or methodology. The City concedes that Patel appropriately relied on epidemiological studies indicating that an unborn baby's exposure through her mother to chemicals, including benzene, is capable of causing chromosomal anomalies and childhood leukemia.[29] The study most favorable to Patel's view found that chromosomal aberrations like Sarah's may result from exposure to concentrations of benzene less than 10 ppm[30]—more than 60 times the level of exposure that Kraft claimed. Another study on which Patel relied found a correlation between exposure to concentrations of benzene greater than 31 ppm and a particular chromosomal aberration, but noted that the effect was "clear[ly] dose dependent".[31] The Pollocks' maximum claimed level of exposure is only 1/200th of that exposure. No study was offered showing a relationship between chromosomal anomalies like Sarah's and exposure to benzene at the lower levels the Pollocks claimed. This is perhaps hardly surprising, since the OSHA standard for maximum exposure to benzene in the work place is 1 ppm[32]—more than six times the Pollocks' exposure, according to Kraft. Given this large gap between the exposure levels in the studies that Dr. Patel relied on and the concentration Kraft hypothesized that the Pollocks had been exposed to, those studies provide no basis for his opinion that the Pollocks' claimed benzene exposure caused Sarah's ALL.

Patel asserted that the Pollocks' exposure to benzene, as found by Kraft, was

29. David A. Savitz & Kurtis W. Andrews, *Review of Epidemiologic Evidence on Benzene and Lymphatic and Hematopoietic Cancers*, 31 AM. J. OF INDUS. MED. 287, 292–294 (1997); Martyn T. Smith & Luoping Zhang, *Biomarkers of Leukemia Risk: Benzene as a Model*, 106 ENVTL. HEALTH PERSP. 937, 943 (1998); Henriette Van Steensel–Moll et al., *Childhood Leukemia and Parental Occupation: A Register–*

*Based Case–Control Study*, 121 AM. J. OF EPIDEMIOLOGY 216, 223 (1985).

30. Smith & Zhang, *supra* note 29, at 941.

31. Luoping Zhang et al., *Interphase Cytogenetics of Workers Exposed to Benzene*, 104 ENVTL HEALTH PERSP. 1325, 1328 (1996).

32. 29 C.F.R. § 1910.1028(c)(1) (2008).

really higher than the exposure levels in the reports on which he relied because it occurred over a longer period. While it is possible that a long-term exposure to a low level of toxin might be worse than a short-term exposure to the toxin at much higher levels, it is just as likely, in the abstract, that the opposite is true.[33] Nothing in any of the materials on which Patel relied supported his assertion.

While some of Sarah's chromosomal anomalies were also found with exposure to benzene, Patel testified others were unrelated to benzene exposure. There is therefore no basis for Patel's testimony that Sarah's pattern of chromosomal anomalies indicate her ALL was benzene-induced. Because neither the epidemiological studies nor the similarities in Sarah's chromosomal anomalies support Patel's opinion that Sarah's ALL was caused by exposure to benzene *in utero*, his testimony was conclusory and cannot support liability.

A few months after this case was tried, the court of appeals in *Exxon Corp. v. Makofski*[34] reviewed all of the studies the parties could produce attempting to link ALL to benzene exposure and concluded that nothing showed a correlation to meet the standard of probative evidence set by this Court in *Merrell Dow Pharmaceuticals, Inc. v. Havner*.[35] The court concluded that the unsupported opinions of the experts in that case were no evidence.[36] For the same reasons, we reach the same conclusion here. Patel's opinions were conclusory and provided no evidence that Sarah's ALL was caused by Tracy's exposure to benzene from the landfill.

## III

The Pollocks claim property damages on the ground that the West Avenue landfill was a nuisance that amounted to a taking of property without adequate compensation in violation of article I, section 17 of the Texas Constitution.

 We have held that the government's "mere negligence which eventually contributes to the destruction of property is not a taking";[37] rather, the government must act intentionally. This requirement is rooted in the constitutional provision that a compensable taking occurs "only if property is damaged or appropriated for or applied to public use."[38] An accidental destruction of property does not benefit the public. The public-use limitation "is

33. See, e.g., LAWRENCE G. CETRULO, TOXIC TORTS LITIGATION GUIDE § 5.14 (2008) ("Proof of exposure is not, by itself, sufficient to prove medical causation. A plaintiff must also prove that he was exposed to a sufficient amount, or dose, of a particular toxin to cause a particular disease. Virtually any agent, even tap water, may produce a toxic effect at a sufficiently high level of exposure. Conversely, it may be argued that even the deadliest poison is harmless at a sufficiently low level of exposure."); FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 403 (2000) (stating that a central tenet of toxicology is that " 'the dose makes the poison'; this implies that all chemical agents are intrinsically hazardous—whether they cause harm is only a question of dose. Even water, if consumed in large quantities, can be toxic." (footnote omitted)).

34. 116 S.W.3d 176, 183 (Tex.App.-Houston [14th Dist.] 2003, pet. denied).

35. 953 S.W.2d 706, 725–726 (Tex.1997).

36. *Makofski*, 116 S.W.3d at 187–188.

37. *City of Tyler v. Likes*, 962 S.W.2d 489, 504–505 (Tex.1997); *see also City of Dallas v. Jennings*, 142 S.W.3d 310, 313 (Tex.2004).

38. *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 554–555 (Tex.2004) (internal quotation marks omitted) (quoting *Steele v. City of Houston*, 603 S.W.2d 786, 792 (Tex.1980)(citing *Davis v. City of Lubbock*, 160 Tex. 38, 326 S.W.2d 699, 702–709 (1959))).

the factor which distinguishes a negligence action from one under the constitution for destruction." [39]

For purposes of article I, section 17, a governmental entity acts intentionally if it knows either "that a specific act [was] causing identifiable harm" or "that the specific property damage [was] substantially certain to result from" the act.[40] A governmental entity is substantially certain that its actions will damage property only when the damage is "necessarily an incident to, or necessarily a consequential result of the [entity's] action." [41] The government's knowledge must be determined as of the time it acted, not with benefit of hindsight.[42]

The Pollocks contend that the City knew its management of the West Avenue landfill[43] was damaging their property, or knew at least that damage to their property was a necessary result. But the evidence is all to the contrary. Whenever the City was aware that gas was migrating from the landfill, it took steps to prevent damage. It monitored gas generation, monitored leachate, and installed methane collection systems. We assume, as the Pollocks assert and the jury found, that those efforts were inadequate and that the City was negligent. But there is no evidence that the City knew that the Pollocks' property was being damaged or that damage was a necessary consequence.

The Pollocks contend that the fact the City knew that subsidence, ponding, and gas generation and migration are inherent in the operation of a landfill is sufficient to show that the City knew its operation of the landfill was substantially certain to damage their property. We rejected essentially the same argument in *City of Dallas v. Jennings*, where homeowners attempted to show the city's intent to damage their property by sewage flooding from the fact that the city knew that unclogging a sewer can sometimes cause it to back up.[44] The governmental entity's awareness of the mere possibility of damage is no evidence of intent. The damage the Pollocks claim—the migration of gas onto their property—is neither necessarily incident to or a consequential result of the operation of a landfill. It can be prevented.[45] The City's negligent failure to prevent landfill gas migration in this case is no evidence that it intended to damage the Pollocks' property.

Since there was no evidence of a compensable taking, the City is immune from the Pollocks' property damage claims.

\* \* \*

We therefore reverse the court of appeals' judgment and render judgment that the Pollocks take nothing on their claims.

Justice MEDINA filed a dissenting opinion, in which Justice O'NEILL joined.

39. *Gragg*, 151 S.W.3d at 555 (quoting *Steele*, 603 S.W.2d at 792).

40. *Jennings*, 142 S.W.3d at 314.

41. *Id.* (citations omitted).

42. *Id.* at 315 ("[T]here is no evidence that the City knew, *when it unclogged the sewer line*, that any flooding damage would occur." (emphasis added)).

43. *See City of Tyler v. Likes*, 962 S.W.2d 489, 504–505 (Tex.1997) (noting that a governmental entity may commit a taking through either the construction of a public work or the subsequent maintenance and operation of one).

44. *Jennings*, 142 S.W.3d at 315.

45. *See* Jeffrey Ball, *Pollution Credits Lets Dumps Double Dip*, WALL ST J., Oct. 20, 2008, at A1. The EPA has issued detailed regulations regarding the operation of a methane collection system. 40 C.F.R. §§ 60.750–.759 (2008).

Justice MEDINA, joined by Justice O'NEILL, dissenting.

The Pollocks claim that Sarah's leukemia was caused by her *in utero* exposure to benzene, which had migrated from the West Avenue landfill into their home. The claim rests on the testimony of two expert witnesses: Dr. Mahendra Patel, a pediatric oncologist and Sarah Pollock's treating physician, and Daniel Kraft, a petroleum engineer with extensive experience in the design, construction, and post-closure maintenance of landfills. Kraft gave his opinion about the amount of benzene in the Pollock home, and how it got there. Dr. Patel testified that Sarah's mother's exposure to benzene during pregnancy caused chromosomal damage, and Sarah's acute lymphoblastic leukemia (ALL). Dr. Patel's opinion was based on a review of the scientific literature on the subject, his differential diagnosis, his treatment of Sarah, and Sarah's chromosomal injury that he described as a unique fingerprint of benzene exposure and damage *in utero*.

The City concedes that methane and benzene migrated from its landfill into the surrounding community. The City also does not contest the underlying science relied on by Dr. Patel or the dangers of exposure to benzene, a known carcinogen. Instead, the City contends that analytical gaps in the testimony of both experts render their respective opinions conclusory. The Court eventually agrees after delving into the underlying science. The Court analyzes the relationship between methane and benzene, the respective physical properties of both gasses, benzene's relationship to certain types of leukemia and chromosomal damage, and the respective testimony of both experts. Most significantly, however, the Court concludes that the City did not have to object or point out these analytical gaps in the trial court to preserve error. I respectfully disagree.

As a general rule, an objection is required to preserve error regarding the admission of evidence, and expert testimony is no exception. *See* Tex.R.App. P. 33.1(a); Tex.R. Evid. 103(a)(1); *Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000). Without an objection, a trial court simply cannot be expected to fulfill its role as gatekeeper. Nor can an appellate court assume this role, particularly after the witnesses have testified, been dismissed, and the record closed. Nevertheless, the Court here assumes the role of gatekeeper *ex post facto,* allowing the City to complain about analytical gaps for the first time on appeal. Because the City did not object to the reliability of either expert witness in the trial court or complain about the analytical gaps it now details in this appeal, I would hold that the complaint has been waived.

I

I agree, however, that analytical gaps can undermine the reliability of an expert's opinion. The Supreme Court said as much in *General Electric Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), observing that courts do not have to focus entirely on the reliability of the underlying methodology or technique as in *Daubert,*[1] but are free to test reliability by analyzing whether the expert's opinion fits the facts of the case:

> [C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in ei-

1. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see also E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549 (Tex. 1995).

ther *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence ... connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id.* at 146, 118 S.Ct. 512; *see also* Richard O. Falk & Robert O. Hoffman, *Beyond Daubert and Robinson: Avoiding and Exploiting "Analytical Gaps" in Expert Testimony,* 33 THE ADVOCATE 71, 72 (Winter 2005). The Supreme Court also has recognized that the trial court's role as gatekeeper, like other rulings on the admission of evidence, is a discretionary decision subject to review only for an abuse of that discretion. *Joiner,* 522 U.S. at 142–43, 118 S.Ct. 512.

This Court soon followed *Joiner,* concluding in *Gammill v. Jack Williams Chevrolet, Inc.,* that an expert's opinion can be unreliable if there is too great an analytical gap between the underlying data and the expert's opinion.[2] 972 S.W.2d 713, 727 (Tex.1998). We cautioned, however, that the trial court's job was not to determine whether an expert's conclusions were correct, but only whether the analysis used to reach them was reliable. *Id.* at 728. We further noted that the trial court's gatekeeper decisions in this regard were to be reviewed under the abuse of discretion standard. *Id.* at 727.

A trial court, however, cannot abuse its discretion if it is never asked to exercise it. Thus, to preserve a no-evidence complaint that expert testimony is unreliable, a party must object in the trial court. *See Mar.*

*Overseas Corp. v. Ellis,* 971 S.W.2d 402, 409–10 (Tex.1998) (objection made after jury verdict was too late); *see also Gen. Motors Corp. v. Iracheta,* 161 S.W.3d 462, 471 (Tex.2005) (objection must be made when deficiency becomes apparent); *Kerr–McGee Corp. v. Helton,* 133 S.W.3d 245, 252 (Tex.2004) (motion to strike made immediately after cross-examination held timely). But an objection is not invariably required; there is a limited exception to the general rule.

When the expert's testimony is speculative or conclusory on its face, a party does not have to object to its admissibility to complain that the expert's naked opinion is no evidence. *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 233 (Tex.2004) ("bare conclusions—even if unobjected to—cannot constitute probative evidence"). It is obviously important then to distinguish unreliable expert testimony from conclusory expert testimony because the former requires a timely objection, while the latter does not. What then separates the conclusory from the merely unreliable?

The distinction apparently is the difference between something and nothing. As the Court recently explained in *Arkoma Basin Exploration Co. v. FMF Assocs. 1990–A, Ltd.,* 249 S.W.3d 380, 389 (Tex. 2008): An expert's testimony is conclusory if the expert merely gave an unexplained conclusion or asked the jury to "take my word for it" because of his status as an expert. *Arkoma* concluded that an expert's opinions were not conclusory even though the expert's foundational data was

---

**2.** One observer has suggested that analytical gaps are of two types: "(1) the underlying data-facts gap, which focuses on material variances between the data underlying the expert opinion and the actual facts of the plaintiff's case; and (2) the methodology-conclusion gap, which focuses on whether the expert

properly explains how the methodology was applied to the plaintiff's facts in arriving at the conclusion." Kimberly S. Keller, *Bridging the Analytical Gap: The Gammill Alternative to Overcoming Robinson & Havner Challenges to Expert Testimony,* 33 ST. MARY'S L.J. 277, 310 (2002).

not in the record, and it was not entirely clear how the expert had reached his conclusions. We wrote:

> [The expert's] testimony could have been a lot clearer; his references to "up here" and "right there" on slides and posters used at trial often make it hard to tell what he is talking about. But we cannot say on this record that his opinions were unreliable or speculative. Nor were they conclusory as a matter of law; [the expert] did not simply state a conclusion without any explanation, or ask jurors to "take my word for it." It is true that without the foundational data in the appellate record, we cannot confirm that "cash off my runs ... divided by mcf" yielded the $1.62, $1.41, $1.43, and $1.59 prices he calculated as the low range for damages. But experts are not required to introduce such foundational data at trial unless the opposing party or the court insists.

*Id.* at 389–90 (footnotes omitted). *Arkoma* further explained when a party should object to preserve error:

> Texas law requires an objection to expert testimony before or during trial if the objection "requires the court to evaluate the underlying methodology, technique, or foundational data," but no objection is required if the complaint "is restricted to the face of the record," as when the complaint is that an opinion was speculative or conclusory on its face, or assumed facts contrary to those on the face of the record.

*Id.* at 388 (footnote omitted) (citing *Coastal Transp. Co.*, 136 S.W.3d at 233). Thus, an objection is not required to preserve an appellate complaint about an expert's naked conclusions, but if the expert purports to rely on something more than his credentials or reputation, an objection is necessary. This exception is rarely applied, probably because naked conclusions ordinarily draw immediate objections.

The exception was applied in *Coastal*, however. In that case, Coastal failed to object to the following testimony from a trucking-safety expert regarding gross negligence:

> Q: When viewed objectively from Coastal's point of view at the time of the September '93 incident, in your opinion, did Coastal's failure to stop using probes that could have [sensor failure] problems, did that involve a high degree of risk, considering the probability and magnitude of the potential harm to others?
>
> A: Yes, it did, very high.
>
> Q: In your opinion, did Coastal have an actual subjective awareness of the risk involved in failing to stop using probes that can have [sensor failure] problems?
>
> A: Yes, again and again.
>
> Q: And in your opinion, did Coastal nevertheless proceed with conscious indifference to the rights, safety, or welfare of others?
>
> A: That's the only conclusion I can draw.

*Id.* at 231. Distinguishing a no-evidence reliability complaint from a no-evidence conclusory complaint, we said that an expert's "bare conclusions—even if unobjected to" are not probative evidence. *Id.* at 233. We thus drew a "distinction between no evidence challenges to the reliability of expert testimony in which we evaluate the underlying methodology, technique or foundational data used by the expert and no evidence challenges to conclusory or speculative testimony that is non-probative on its face." *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 910 (Tex.2004) (citing *Coastal Transp. Co.*, 136 S.W.3d at

233).[3] *Coastal* did not involve a reliability challenge requiring an objection in the trial court because there was nothing for the trial court to evaluate; the expert did not purport to use any methodology, technique, or foundational data but rather merely delivered his subjective opinion concerning Coastal's gross negligence. That is not the present case.

In rendering his opinion, Kraft, the landfill engineer, used a generally accepted Environmental Protection Agency ("EPA") landfill air model,[4] testimony regarding odors in the Pollock home indicative of the presence of organic hydrocarbons, such as benzene, the City's gas monitoring records, a physical site inspection, and two decades of historical geologic records and maps. Because no benzene readings had actually been taken at the Pollock home, Kraft relied on, among other things, a 1998 benzene reading from a sealed monitoring well known as GMP–9A. This well was in the landfill 100 feet from the Pollock home and 128 feet underground. Although the reading at GMP–9A was taken more than four years after Sarah's alleged *in utero* exposure in 1993, Kraft concluded that the benzene levels in the Pollock home would have been equal to or greater than that of a sample taken from the well in 1998, that being, 160 ppb (parts per billion) benzene.

The City argues that Kraft's opinion is conclusory because he does not explain how the benzene concentration level in the Pollock home can be the same as that in a sealed testing well. Although Kraft's opinions were predicated on various reports and an EPA landfill gas emissions model, the City maintains that his testimony contains a fatal "analytical gap" because he failed to account for atmospheric conditions. This analytical gap, the City argues, renders Kraft's opinion conclusory.

The complaint, however, goes to Kraft's methodology or technique in evaluating the data because he was comparing benzene concentrations not only at different locations but also at different points in time. Relying on his air model, Kraft testified that the benzene levels produced by the landfill peaked in the late seventies and began to diminish thereafter. Thus, benzene levels would have been higher in 1993 during Sarah's gestation than in 1998 when the benzene reading from the monitoring well was taken. Kraft testified to the following without objection:

Q. Mr. Kraft, have you done any calculations and projections about the migration of gas that the—from the

---

3. The Court suggests that *Ramirez* concerned only a conclusory challenge, but the case also involved a reliability complaint. One significant issue in the case was when the left rear wheel on the Volkswagen came off its axle. *Ramirez*, 159 S.W.3d at 902. Edward Cox, the plaintiff's metallurgical expert at trial, testified that a defective bearing caused the wheel to separate from the axle. *Id.* at 910. Cox "was not offered as an accident reconstructionist to help establish when … the defect caused the accident," and the Court rejected his "limited opinions on the causation issue" as conclusory. *Id.* at 910–11. When the Court says here that there was no objection, it is referring to Cox's testimony. *See* 284 S.W.3d at 818 & n. 27. Volkswagen objected to the testimony of Ronald Walker,

the plaintiff's accident reconstructionist, and that testimony was analyzed by the Court under "the standards of reliability." *Id.* at 904. The *Ramirez* Court concluded that Walker's opinion was indeed unreliable because of a particular analytical gap in his analysis. *Id.* at 906. Thus, the trial court abused its discretion in admitting the testimony and erred in not sustaining Volkswagen's objection.

4. Kraft estimated the methane-benzene generation ratio by using the USEPA Landfill Gas Generation Model (LandGEM) version 2.01. The model was developed by the EPA's Control Technology Center for estimating landfill gas emissions.

West Avenue Landfill to the Pollock home during the period 1992 to 1994?

A. Yes.

* * *

Q. Okay. What kind of records did you look at in reaching your opinions?

A. Field data sheets from methane surveys that were done in the neighborhood surrounding the landfill, interoffice correspondence with the City of San Antonio, letters to the City of San Antonio from the TNRCC [Texas National Resource Conservation Committee] and the Texas Department of Health, records on geologic data that was collected by City employees, reports that were produced by the City's consultants.

* * *

Q. Do you have an opinion, Mr. Kraft, as to whether the Pollocks were chronically exposed to benzene concentrations in their home?

A. Yes, I do have an opinion on that.

Q. And what is that opinion?

A. It's my opinion that they were chronically exposed to landfill gas.

Q. And did the landfill gas include benzene?

A. Yes, it did.

Q. What is your opinion of the range of benzene to which they were exposed? And please express it in terms of a numerical value.

A. I believe that they were consistently exposed to benzene concentrations in the vicinity of 160 parts per billion, or even higher.

Q. In your report, Mr. Kraft, I believe you said 40 to 160 parts per billion; is that correct?

A. That's correct.

Q. Why are you now saying it might be higher than 160 parts per billion?

A. For several reasons.

Q. And what are those reasons?

A. Number one would be the gas modeling that I did with the United States Environmental Protection Agency model, the—you know, the landfill gas emissions model, which indicates that the amount of benzene produced by the landfill decreased over time.

Q. What other reasons, Mr. Kraft?

A. The analytical results that were collected at GMP–9 in January of 1998, they also measured the oxygen concentration. Landfill gas—landfill gas samples that have over 2 percent oxygen indicate that there has been some dilution from atmospheric air occurring, therefore, the concentrations that were measured in that sample were likely to be slightly lower than they were in the actual landfill gas itself, because it was diluted while they were sampling it.

In accordance with the City's argument, the Court suggests that Kraft testified that the air in the Pollock's home was the same as that in the sealed well, but the above demonstrates this to be an inaccurate representation of his testimony. Kraft testified that the concentration of gas in the landfill was likely higher than the samples taken from the well because these samples had already been diluted with atmospheric air. Thus, the Court assumes the existence of an analytical gap that may have existed, but also might have been explained had the City made an appropriate objection.

Next, Dr. Patel, the pediatric oncologist, gave his opinion that Sarah's *in utero* exposure to benzene during the first trimes-

ter caused her ALL. He relied on: (1) his review of the literature, (2) the matched pattern of abnormalities in Sarah's chromosomes and the chromosomal abnormalities in lab-induced carcinogenesis caused by benzene exposure, (3) his academic background in human genetics, and (4) Kraft's opinion that Sarah's mother was chronically exposed to at least 160 ppb of benzene while Sarah was *in utero*. Dr. Patel, moreover, excluded other plausible factors for Sarah's ALL, including family history and benzene exposure from other sources.

While the City acknowledges that Dr. Patel based his opinion, in part, on his review of certain epidemiological studies, it maintains that Dr. Patel's testimony is conclusory because none of these studies actually support his scientific opinion. In particular, the City argues that these studies all involve substantially higher exposure levels and, moreover, fail to find a causative association between benzene exposure and Sarah's particular type of leukemia. None of these concerns were brought to the trial court's attention, and Dr. Patel testified without objection.

Moreover, Dr. Patel explained that the exposure levels in these studies were actually less than Sarah's daily, chronic exposure during gestation. Dr. Patel explained that the effect of a toxin is based on two types of exposure, the peak dose exposure and the duration of that exposure. Taking both into account, the studies report their results as cumulative exposure over time,

often as an annual dosage. Dr. Patel testified that the Pollocks' chronic exposure here would convert to a much greater annual dosage than those discussed in the studies. Moreover, Dr. Patel testified that Sarah's chronic and cumulative *in utero* benzene exposure as a developing fetus was more significant than the annual exposure to an adult as described in the studies. Again, there was no objection to these conclusions.

The underlying epidemiological studies referenced by Dr. Patel reflect a correlation between exposure to benzene and an increased risk for certain types of leukemia. For example, the studies in evidence reflected that occupational benzene exposure in the mother was related to a risk of childhood leukemia, especially acute nonlymphocytic leukemia ("ANLL"); that benzene metabolites could cause chromosomal damage in human lymphocytes; that benzene could cross the placenta and harm a fetus; that exposure to benzene could cause chromosomal damage similar to that suffered by Sarah; and that benzene exposure is responsible for at least a portion of childhood cancers of which ALL is the most common. Dr. Patel further testified about epidemiological evidence linking benzene to another form of leukemia, acute myeloid leukemia ("AML"), and quoted from the article "that evidence linking benzene to AML is no less persuasive than for ALL." None of this testimony came as a surprise to the City as Dr. Patel had made these same points in his expert report.[5]

---

5. In the concluding paragraphs of that report, Dr. Patel stated:

> If one looks at Sarah's chromosomal markers as mentioned above, the specific chromosomal aberrations noted and those detected in benzene-exposed workers are remarkably similar. There is aneuploidy, i.e.: > 46 chromosomes and specifically in benzene exposed workers there were trisomies in the G group of chromosomes as

> noted for Sarah, specifically for chromosomes: 7, 8, 9 and 21. It should be noted that the association with childhood leukemia and benzene exposure has been reported from Holland, China, United States, Britain and Japan.
>
> Particularly of parental exposure of solvents containing benzene, there is an increased risk of childhood leukemia. The odds ratio for parental benzene exposure was as high

The opinions and testimony of the engineer and doctor here are far removed from the "bare conclusions" we rejected as conclusory in *Coastal.* *See Coastal Transp. Co.,* 136 S.W.3d at 232 (witnesses qualifications and bare opinion not enough). Neither expert asked the jury to trust their opinion merely on the basis of their expertise. They instead purported to analyze the underlying data that they (and apparently the City also) considered relevant before rendering their respective opinions.

The City's present complaints about analytical gaps is nothing more than an unpreserved reliability challenge. Analytical gaps are not complaints about naked opinions, lacking any basis in the record, but rather are assertions that specific errors or omissions in an expert's analysis render his or her opinion unreliable. *See, e.g., Ford Motor Co. v. Ledesma,* 242 S.W.3d 32, 38–39 (Tex.2007); *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 578 (Tex.2006); *Cooper Tire & Rubber Co. v. Mendez,* 204 S.W.3d 797, 800 (Tex.2006); *Kerr–McGee*

*Corp.,* 133 S.W.3d at 254; *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 629 (Tex. 2002). When the complaint is that the expert's analysis of otherwise reliable scientific data is flawed or that the underlying data itself is questionable, a party must object to preserve its complaint. *See Guadalupe–Blanco River Auth. v. Kraft,* 77 S.W.3d 805, 807 (Tex.2002) ("a party must object to the testimony before trial or when it is offered"); *see also Gen. Motors Corp.,* 161 S.W.3d at 471 (objection must be made when deficiency becomes apparent). And the failure to object to expert testimony cannot be cured through cross-examination or counter-expert testimony. *Gen. Motors Corp. v. Sanchez,* 997 S.W.2d 584, 590–91 (Tex.1999). The Court's opinion today unfortunately blurs the distinction between expert testimony that purports to have a basis in science (unreliable expert testimony) and expert testimony that lacks any apparent support apart from the expert's claim to superior knowledge (conclusory expert testimony).[6] The

---

as 5.81. As mentioned above it was suggested benzene and its metabolites may cause genetic damage in germ cells, which are then passed on to the offspring and/or cause direct genetic damage in developing fetus following maternal exposure.

It also suggests that there is an increased likelihood of ALL when such an exposure occurs during the critical organogenesis phase if not as germ mutation. In-vitro experimentation using human leukemia cells HL60 and human lymphocytes following exposure to benzenetriol, a direct derivative of benzene, shows oxidated DNA damage. Similar DNA damage has also been shown to correlate in animal model systems. It has been mentioned that benzene is associated with acute myeloid leukemia; however, the overall data clearly does not indicate association limited to AML but also to ALL.

Thus, after reviewing the literature and Sarah's case, per se, it is in my medical opinion that there is reasonable medical and scientific certainty and probability of linking maternal exposure to benzene, organic

acids and hydrocarbons in the environment with the development of ALL in Sarah Pollock.

**6.** The Court's indiscriminate mixing of unreliable and conclusory expert opinions is most apparent in its reliance on *Exxon Corp. v. Makofski,* 116 S.W.3d 176 (Tex.App.-Houston [14th Dist.] 2003, pet. denied), a court of appeals' opinion written by a current member of this Court, and *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706 (Tex.1997). In both cases, timely objections were made to the reliability of the respective experts. JUSTICE BRISTER, writing for the Fourteenth Court of Appeals, observed that it was the defendant's responsibility "to object at trial (which it did repeatedly) so the plaintiffs would have an opportunity to cure any defects regarding reliability and present us with a fully developed record." *Makofski,* 116 S.W.3d at 180–81 (citations omitted). Having preserved its complaint, the court of appeals subsequently concluded that the expert's testimony was unreliable and thus no evidence because "[n]o epidemiological study estab-

Court's decision today is not only wrong, it is also unfair and may encourage gamesmanship in the future. Why have a pre-trial *Robinson* hearing or make a reliability objection during trial and run the risk that the proffering party may fix the problem, when the expert's opinion can be picked apart for analytical gaps on appeal? *See Robinson,* 923 S.W.2d at 552; *see also Ellis,* 971 S.W.2d at 411.

Reliability objections are important; they serve several purposes. First, they give the proffering party an opportunity to cure any defects, thus, avoiding trial and appeal by ambush; second, they give the trial court the opportunity to test and question the expert's testimony and thereby intelligently perform its role as gatekeeper; and, third, they result in a more fully developed record for appellate review under the abuse of discretion standard. *Ellis,* 971 S.W.2d at 409, 412. Because the City's complaints here go to reliability, an objection was required. Because the Court holds otherwise, I dissent.

## II

I agree with the Court, however, that there is no evidence to support the Pollocks' takings claim under article I, section 17 of the Texas Constitution for damage to their property. The Pollock's theory in this case was that the City effectively took their property (and caused their daughter's illness) by failing to abate the migration of benzene gas from the landfill after learning of the problem. I agree with the Court that there is no evidence of the City's requisite intent for a takings claim

here. 284 S.W.3d at 812 (citing *City of Dallas v. Jennings,* 142 S.W.3d 310, 314 (Tex.2004)). Nor do I find any basis for the Pollocks' personal injury claim under this constitutional provision.

Article I, section 17, entitled "Taking, damaging or destroying property for public use," does not mention bodily injury or death. TEX. CONST. art. I, § 17. It refers only to property, granting the government the legal right to take property for a public purpose with the corresponding obligation to pay for it. Thus, the "State, in the exercise of its sovereign power, has the unquestioned right to take, damage, or destroy private property for public use," *State v. Hale,* 136 Tex. 29, 146 S.W.2d 731, 736 (1941), but the constitution does not authorize the state to kill or cause bodily injury when doing so. Government actions that cause death or personal injury are neither validated, nor compensated, as the lawful exercise of the State's eminent domain authority. Such actions may be subject to other types of lawsuits, but they are not the basis for liability under the takings clause of our constitution. 1 GEORGE D. BRADEN, ET AL., THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS 63 (1977).

I accordingly agree with the Court that the Pollocks cannot recover under Article I, Section 17 because there is no evidence that the City intended a taking, and, apart from that, no basis for the award of personal injury damages even had the City intended to damage the Pollocks' property.

---

lished a statistically significant doubling of the risk of ALL from exposure to benzene" as required by *Havner. See id.* at 188. This Court then concludes that "[f]or the same reasons, we reach the same conclusion here." 284 S.W.3d at 820. But this case is not *Makofski* or *Havner* as the City conceded during oral argument, stating: "We cannot go

into the statistical significant part of *Havner* because we did not object to the scientific reliability, we didn't make a *Daubert* objection and we have not tried to do that." Thus, the Court's conclusion is based on an authority the City has expressly conceded does not apply.

## III

Although the Pollocks do not have a takings claim, they have also asserted a negligence claim, raising the issue of whether the Tort Claims Act applies here to waive the City's governmental immunity. *See* TEX. CIV. PRAC. & REM.CODE §§ 101.001–.109. The Tort Claims Act provides a limited waiver of governmental immunity "when personal injury or death is caused by a 'use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.'" *Texas A & M Univ. v. Bishop,* 156 S.W.3d 580, 583 (Tex.2005) (quoting TEX. CIV. PRAC. & REM.CODE § 101.021(2)). Neither the court of appeals nor this Court has considered this issue, albeit for different reasons. The court of appeals, having concluded that the Texas Constitution authorized the Pollocks' claims, found application of the Tort Claims Act unnecessary. 155 S.W.3d 322, 332–33. This Court, on the other hand, renders any waiver under the Act irrelevant by concluding there is no evidence that the City's negligence caused Sarah's leukemia. Because I disagree with both conclusions, I turn now to the arguments on this issue.

The City argues that the Tort Claims Act does not apply in this case because the Pollocks failed to establish a claim within its narrow waiver of immunity. The City's argument focuses on the court's charge that asked the jury (1) whether the "negligence, if any, of the City of San Antonio proximately caused the occurrence or injury in question" and (2) whether the City's "operation of the West Avenue Landfill constituted a nuisance" as that term was defined in the charge. The jury answered yes to both questions. The City objected to the charge, arguing that the case should be submitted as a premises liability case rather than as a case of general negligence and nuisance. The City submits that this charge error is fatal to the Pollocks' claim of waiver under the Act. I disagree.

"Premises liability is the body of law that [defines] the duties owed by an owner or occupier of land to persons who come onto his or her real property to protect them from injury on account of dangerous conditions or activities on the property." 19 WILLIAM V. DORSANEO III, TEXAS LITIGATION GUIDE § 310.01[1] at 310–6 (2009). It is not a separate species of tort but rather a branch of the law of negligence that categorizes duty in relation to the plaintiff's purpose for entering the property, that is, as an invitee, licensee, or trespasser. *Western Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex.2005). A premises liability case requires that the jury be instructed on the elements of the landowner's duty and thus the distinction between general negligence and premises liability remains important in Texas. *See Clayton W. Williams, Jr., Inc. v. Olivo,* 952 S.W.2d 523, 529 (Tex.1997) (rule stated in context of general contractor's liability for negligence of subcontractor); *see also Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 551 (Tex.1985) (Kilgarlin, J., concurring) (suggesting that modern trend is "away from basing a landowner's liability on his visitor's artificially determined purpose of entry").

By definition then a premises liability case involves an injury on the defendant's premises. But Sarah Pollock was not injured on the City's property; she became ill at her own home, allegedly because of the City's negligent use and management of the neighboring landfill. The duty owed by the City under these circumstances is not dependent on Sarah's status as an invitee, licensee, or trespasser, and thus the Pollocks' claim is not a premises liability case. The duty here instead rests on the City's obligation not to contaminate

adjoining private property with its waste disposal operations at the West Avenue Landfill.

The jury found that the City's operation of the landfill was both negligent and a nuisance. Although there was not evidence that the nuisance rose to the level of a taking, there was evidence that the City's negligence was a cause of the nuisance created by the landfill. We have said that personal injury damages may be recovered under these circumstances. *See Vann v. Bowie Sewerage Co.,* 127 Tex. 97, 90 S.W.2d 561, 563 (1936) (nuisance created by private sewage company sickening neighboring property owner); *City of Fort Worth v. Crawford,* 74 Tex. 404, 12 S.W. 52, 54 (1889) (nuisance created by operation of garbage dump causing illness). Moreover, this Court and others have recognized that an owner or occupier's negligence on its own property may lead to liability for injuries suffered on adjoining property.[7]

I conclude then that the negligent operation of a landfill that causes a neighbor to become ill on her adjoining property is a condition or use of property causing personal injury within the contemplation of the Tort Claims Act. *See* TEX. CIV. PRAC. & REM.CODE § 101.021(2) (governmental unit of the State may be liable for personal injury or death caused by a condition or use of tangible personal or real property if a private person would be liable under Texas law). The Tort Claims Act, however, limits the State's liability for the bodily

injury or death of a person to the "maximum amount of $250,000." TEX. CIV. PRAC. & REM.CODE § 101.023(a). I therefore would modify the court of appeals' judgment to reflect the $250,000 cap imposed by the Tort Claims Act, and, as modified, affirm the judgment awarding damages for Sarah Pollock's personal injury.

Justice GREEN did not participate in the decision.

---

7. *See, e.g., Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910–911 (Tex.1981) (owner or occupier liable for injury caused by debris falling across public street from building being demolished); *Atchison v. Tex. & P. Ry. Co.,* 143 Tex. 466, 186 S.W.2d 228, 229 (1945) (duty breached when smoke from a grass fire on the defendant's premises reached an adjacent public highway, causing a collision); *Texas & P. Ry. Co. v. Brandon,* 183 S.W.2d 212, 214 (Tex.Civ.App.-Eastland 1944, writ

ref'd) (duty to keep premises free of combustible materials to avoid fire that could spread to neighboring property); *Skelly Oil Co. v. Johnston,* 151 S.W.2d 863, 863–67 (Tex.Civ.App.-Amarillo 1941, writ ref'd) (gasoline manufacturing plant liable for creating oil slick on adjoining highway); *see also* J. HADLEY EDGAR, JR. & JAMES B. SALES, TEXAS TORTS & REMEDIES § 20.08, Liability for Losses Outside Property (2009).