**Affirmed and Memorandum Opinion filed April 17, 2012.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-11-00111-CV

---

### RICHARD A. MARTINI, Appellant

### V.

### CITY OF PEARLAND, Appellee

---

**On Appeal from the Co. Civil Ct. at Law No. 1**
**Harris County, Texas**
**Trial Court Cause No. 832152**

---

## M E M O R A N D U M   O P I N I O N

Appellee City of Pearland initiated a statutory eminent domain proceeding to acquire a small strip of appellant Richard A. Martini's five-acre tract of land for the construction of Kirby Drive. Martini filed an inverse condemnation counterclaim, alleging that the construction of Kirby Drive "destroyed the natural drainage flow and causes water to be impounded" on the Martini tract. Martini sought injunctive relief, a declaratory judgment, and damages, which the trial court denied. We affirm.

BACKGROUND

Martini owns an approximately five-acre tract of undeveloped land that is bordered by Beltway 8 to the north and Kirby Drive to the east. Before the construction of Kirby Drive, rainwater accumulating on the Martini tract "sheet drained" to the east and southeast—where it would collect in a drainage system inlet to the north, or in a flood-control drainage ditch along the eastern boundary of the property before running to Clear Creek just south of the Martini tract. The City initiated a statutory eminent domain proceeding to acquire a narrow strip along the eastern boundary of the Martini tract, upon which Kirby Drive later was constructed. The construction included filling in the flood-control drainage ditch and elevating the roadbed above the grade of the surrounding property, which interrupted the ability of water to "sheet drain" off the property to the east. To allow for drainage from the Martini tract, the City built a new "box-like concrete inlet with horizontal slots" on the southeast corner of the property by which water could drain into the new Kirby Drive storm sewer system.

Martini filed an inverse condemnation counterclaim in the statutory eminent domain proceeding, claiming that the manner in which Kirby Drive was constructed constituted a taking by the City because "the extent of inundation" of the Martini tract in the event of a 100-year flood has been "greatly increased by the road and sewer construction," decreasing the market value of the Martini tract.

During the September 2009 bench trial of Martini's counterclaim,[1] Martini presented expert testimony from Dr. James Duke, Ph.D., P.E. Duke opined that the horizontal slots of the inlet, which open into the drain pipe at an elevation higher than the that of the Martini tract, create a "weir effect," causing the water on the Martini tract to rise a minimum of 0.66–1.05 additional feet above the elevation of the inlet slots in order to flow over the edge of the slots. Based on a stated elevation of 57.17 feet above sea

---

[1] Martini did not otherwise challenge the City's statutory eminent domain action.

level for the inlet slots, he opined that the elevation of water on the Martini tract therefore would rise to a minimum of 57.83 or 58.22 feet above sea level in a 100-year flood.

Duke also testified regarding, among other things, an engineering parameter called Hydraulic Gradient Line (HGL), which is a technical expression of the elevation to which water in a conduit would rise if it were not constrained. He explained that if the HGL within a drain pipe is greater than the elevation of the inlet opening, the result will be either a reverse flow of water on to the land, or pooling of water above the elevation of the inlet that cannot flow into the inlet or storm sewer. Duke additionally opined that the City's calculations show that water inside the storm sewer drain pipe connected to the Martini tract inlet in a 100-year flood after the construction of Kirby Drive would reach an HGL of 57.46 feet above sea level, and that the water on the Martini tract therefore would rise even higher than his calculated minimum elevations in order to enter the inlet because the calculations must account for "pressure flow," rather than "open flow" into "open channels with an air-water interface in the pipes." However, Duke acknowledged at trial that his calculations were based on measurements showing the elevation of the inlet slots at 57.17 feet above sea level, and the City presented evidence that the inlet later was lowered to 55.15 feet above sea level.

Duke also acknowledged that he did not do any calculations to determine the maximum water elevation on the Martini tract in a 100-year flood before the construction of Kirby Drive.[2] He testified that he relied on Federal Emergency Management Agency (FEMA) maps to estimate the water elevation in a 100-year flood and to opine that the Martini tract suffered increased water inundation after the construction of Kirby Drive.[3]

The City presented the testimony of its expert Lonnie Anderson, a civil engineer specializing in drainage, who agreed that the water inside the drain pipe connected to the

[2] He also testified that he was unaware of whether a five-year flood event would cause pooling or standing water on the Martini tract before the construction of Kirby Drive.

[3] Martini's expert Charles Gamble testified as to some of the same conclusions, as well as potential remedial measures to reduce the amount of standing water on the Martini tract in a 100-year flood.

inlet on the Martini tract in a 100-year flood would reach an HGL of 57.46 feet above sea level. However, he testified that in the event of a 100-year flood, the maximum water elevation on the Martini tract both before and after the construction of Kirby Drive is 57.46 feet above sea level, and that the inlet installed at an elevation of 55.15 feet above sea level was designed to and does maintain this maximum water elevation. He testified that the Martini tract would have flooded in a 100-year flood before the construction of Kirby Drive and would have continued to drain for several days after the event due to the elevation of the land and the small capacity of the flood-control drainage ditch. He also testified that the concrete storm system installed with the construction of Kirby Drive provides more efficient and thus improved drainage of water from the Martini tract in a 100-year flood.

The trial court signed a final judgment on October 25, 2010, ordering that Martini take nothing on his counterclaim. On November 19, 2010, Martini filed a Motion for New Trial based on newly discovered evidence, which the trial court denied. The trial court signed findings of fact and conclusions of law on May 31, 2011, stating, among other things, that the construction of Kirby Drive did not negatively impact the Martini tract or cause adverse consequences to the drainage from the Martini tract in a 100-year flood.

Martini appeals, arguing that (1) Anderson's opinion regarding the "improved drainage" after the construction of Kirby Drive cannot constitute legally sufficient evidence to support the trial court's findings because Anderson's opinion is conclusory; (2) assuming we determine that the trial court could not have relied on Anderson's opinion, the remaining evidence shows Martini established entitlement to relief for his inverse condemnation claim; and (3) the trial court should have granted his motion for new trial based on newly discovered evidence.

4

## I.    Anderson's Testimony

Martini argues in Issue 1 that Anderson's opinion regarding the "improved drainage" after the construction of Kirby Drive cannot constitute legally sufficient evidence to support the trial court's findings because Anderson's testimony was based upon facts he "admitted were erroneous," rendering his opinion "conclusory." Martini argues in Issue 2 that, assuming we determine that the trial court could not have relied on Anderson's opinion, the remaining evidence shows Martini established entitlement to relief for his inverse condemnation claim.

### A.    Applicable Law

Texas Rule of Evidence 702, entitled "Testimony by Experts," permits a witness qualified as an expert by "knowledge, skill, experience, training, or education" to testify on "scientific, technical, or other specialized" subjects if the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. To meet these standards of admissibility, an expert must not only be qualified, but his proposed testimony must be relevant and reliable. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 904 (Tex. 2004); *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 555–56 (Tex. 1995) (adopting and applying analysis from *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993), to review admissibility of expert testimony under Texas Rule of Evidence 702).

Regardless of whether expert testimony properly is admitted, an expert opinion may constitute no more than a mere scintilla of evidence under a legal sufficiency analysis if the opinion (1) is not reliable under the same standards that govern admissibility; or (2) is speculative or conclusory on its face, or assumes facts contrary to the undisputed facts. *See Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004) (considering legal sufficiency challenge to expert opinion because, reliability aside, the opinion was alleged to be "conclusory or speculative and

5

therefore non-probative on its face"); *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997) (considering legal sufficiency challenge regarding expert opinion under *Daubert* reliability standards for admissibility; "[w]hile Rule 702 deals with the admissibility of evidence, it offers substantive guidance in determining if the expert testimony is some evidence of probative value"); *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499–500 (Tex. 1995) ("When an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment."). Because the rules of error preservation differ between these two types of evidentiary sufficiency challenges on appeal, and because Martini failed to raise his issue on appeal in the trial court, it may be helpful to explain the applicable standards.

**Reliability.** The scientific technique or principle underlying an expert opinion must be reliable, among other things, in order to be admissible and to constitute more than a scintilla of evidence. *Robinson*, 923 S.W.2d at 557; *Taber v. Roush*, 316 S.W.3d 139, 148 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *see also Havner*, 953 S.W.2d at 712–13. Scientific evidence that is not grounded "'in the methods and procedures of science' is no more than 'subjective belief or unsupported speculation.'" *Robinson*, 923 S.W.2d at 557 (quoting *Daubert*, 509 U.S. at 590); *Taber*, 316 S.W.3d at 148. Such unreliable evidence is of no assistance to the trier of fact and therefore is inadmissible, and constitutes no more than a scintilla of evidence. *Robinson*, 923 S.W.2d at 557; *see also Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex. 1998).

In determining whether expert testimony is reliable, a court may consider the factors set out in *Robinson* regarding scientific theories and techniques,[4] as well as the

---

[4] *Robinson* set out the following list of non-exclusive factors: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses that have been made of the theory or technique. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 n.6 (Tex. 2009) (citing *Robinson*, 923 S.W.2d at 557).

expert's experience. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009). The Texas Supreme Court has explained that, although these *Robinson* factors cannot always be used in assessing the reliability of an expert opinion, there must be some basis for the opinion offered to show its reliability. *Mendez*, 204 S.W.3d at 801 (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998)); *Taber*, 316 S.W.3d at 148. Under such circumstances, expert testimony is unreliable if there is simply too great an "analytical gap" between the data and the opinion proffered, such that the opinion is "connected to existing data only by the *ipse dixit* of the expert." *Gammill*, 972 S.W.2d at 727 (internal quotation omitted); *see also Taber*, 316 S.W.3d at 148 (citing *Mendez*, 204 S.W.3d at 800). "It is well established that an expert must show the connection between the data relied on and the opinion offered." *Ramirez*, 159 S.W.3d at 906 (citing *Gammill*, 972 S.W.2d at 726).

The criteria for assessing reliability under either or both the *Robinson* factors and the *Gammill* analytical-gap analysis "must vary depending on the nature of the evidence." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 579 (Tex. 2006) (citing *Gammill*, 972 S.W.2d at 726). "[W]hen a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis." *Coastal Transp. Co.*, 136 S.W.3d at 233. Examination of the expert's underlying methodology as part of a reliability challenge is "a task for the trial court in its role as gatekeeper, and [is] not an analysis that should be undertaken for the first time on appeal." *Id.* (explaining prior holding in *Ellis*, 971 S.W.2d at 412). This rule allows the trial court to exercise its discretion in making a determination of whether the expert testimony is sufficiently reliable, and applies when a party makes a challenge to the sufficiency of the evidence based on the unreliability of an expert opinion. *Id.* "Without requiring a timely objection to the reliability of the scientific evidence, the offering party is not given an opportunity to cure any defect that may exist, and will be subject to trial and appeal by ambush." *Ellis*, 971 S.W.2d at 409. Failure to do so waives the issue for

7

appellate review. *See id.* at 409–10.

**Face of the Record.** Regardless of whether an expert's opinion is reliable, we are not required on appeal "to ignore fatal gaps in an expert's analysis or assertions that are simply incorrect" according to the face of the record. *Ramirez*, 159 S.W.3d at 912. "[I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009). If a complaint regarding the sufficiency of an expert opinion "is restricted to the face of the record"—as when the complaint is that an opinion is speculative or conclusory on its face, or assumes facts contrary to those on the face of the record—no objection to the trial court is required. *Arkoma Basin Exploration Co., Inc. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 388 (Tex. 2008) (citing *Coastal Transp. Co.*, 136 S.W.3d at 233 (regarding speculative or conclusory opinions), *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982) (opinion that physician should have warned of possible skull fracture was legally insufficient because it assumed physician was aware of fracture when there was no proof he was), and *City of Keller v. Wilson*, 168 S.W.3d 802, 813 (Tex. 2005) ("[I]f an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded.")). Such a complaint properly may be raised for the first time on appeal as part of a legal sufficiency challenge. *Coastal Transp. Co.*, 136 S.W.3d at 233.

With these principles in mind, we turn to Martini's issues.

## B. Martini's Issues

Martini asserts in his brief that "[t]he initial claim, the claim throughout trial[,] and the claim now" is that "the replacement of the flood control ditch by the City and its installation of inadequate drainage" caused "an increase in the area on [Martini's] tract which will be impacted by a 100-year flood." Martini emphasizes that Anderson conceded during trial that in a 100-year flood, the HGL of the water in the new drain pipe connected to the Martini tract inlet will be over two feet higher than the elevation of the

8

inlet slots.[5]  Martini argues that Anderson acknowledged that water at that elevation will not actually be able to flow into the inlet based on these calculations,[6] and that Anderson's opinion that the Kirby drainage system "**will handle**" a 100-year flood therefore suffers from "a factual fatal flaw" because it is based on a physical impossibility[,] i.e., that water will freely flow 'uphill.'" (emphasis added).  Martini argues that he was not required to object in the trial court to preserve this complaint for appeal because he bases his argument on the "conclusory" nature of Anderson's opinion.

If Anderson had testified that the Kirby Drive drainage system was designed to "handle" all the water on the Martini tract, then the undisputed facts on the face of the record—that the HGL in the drain pipe will be over two feet higher above sea level than the inlet slots—would directly contradict such an opinion.  However, Anderson did not opine that the Kirby Drive drainage system would "handle" all of the water, but that it "provides equal capacity to what existed before in terms of the hundred-year HGL. . . . [T]he peak water surface, or [HGL], at this southeast corner is equal to what existed before the project."  Anderson testified:

> Q. If you determined pre-Kirby [Drive] that in a 100-year flood, the water elevation would be at 57.46, have you done the calculations to determine what the water level would be on the Martini property in a hundred-year event after the construction of Kirby [Drive]?
>
> A. Yes, I have.
>
> Q. Okay.  And what does that model tell you?

---

[5] Anderson testified:

Q. Isn't it true you calculated the water surface for a hundred-year flood, or an HGL, of 57.46 [feet above sea level]?

A. Yes.

Q. And that's 2 feet higher than your inlet?

A. Yes.

Q. So it's going to be HGL in the pipe of 57.46?

A. The HGL in the pipe is higher than the inlet.

[6] Based on the testimony at trial, we understand that water would be able to flow into the inlet when the water elevation on the Martini tract begins to exceed the HGL of the water in the drain pipe.

A. It tells me 57.46 is the maximum elevation.

Q. Okay. In other words, the — the same water elevation is what you would expect on the Martini property before and after the construction of Kirby [Drive]?

A. Exactly.

\* \* \*

Q. Let me ask you this, Mr. Anderson. Obviously if you looked at that picture [showing standing water on the Martini tract in an event described by Anderson as a 100-year flood that occurred after the construction of Kirby Drive], you are saying to yourself, Wow, there seems to be a lot of water out there."

So my question is this: What would you have expected the photo to look like before the construction of Kirby [Drive], assuming the same rainfall intensity?

A. You would have seen the same flooding on the Martini tract. And, actually, more water — there would have been water standing where the roadway is. The roadway is standing up out of the water now; but had the roadway not been there, everything would have been flooded to the same depth. The roadway is not causing the depth of water on the Martini tract to be any higher.

Q. And what about the duration that you would expect water to remain on the Martini property in such a rainfall event before the construction of Kirby [Drive] and after the construction of Kirby [Drive]?

A. After the construction, I would expect it to be fully drained off within at least a day, maybe a day and a half, all dependent on what the flood level was in Clear Creek. If it was up high, you can't overcome that depth, so you have to wait for the Clear Creek to drop in order for the water to come out?

Before the project, I would have expected it to be in the number of days coming out, just based on what I've seen for the capacity of that existing ditch to drain water.

\* \* \*

A. Now, when I say it's more efficient, it's — the existing ditch out there had a very — was very irregular in shape, overgrown, et cetera. Once you have a hundred-year event, it could take several days for that water to trickle out through this small drainageway. . . . We have a deeper storm sewer system. It's concrete pipes, maintained ditch that it's outfalling into. It's just — it's — at a steeper slope. There's more grade on it.

Anderson's testimony reflects his opinion that drainage on the Martini tract was not negatively impacted by the construction of Kirby Drive, in that the maximum water elevation on the Martini tract in a 100-year flood remains the same, and that the rate at which the water ultimately will drain from the Martini tract has improved. We disagree that this opinion suffers from a "fatal flaw," is speculative or conclusory on its face, or assumes facts contrary to those on the face of the record.

At its core, Martini's complaint on appeal is that he disagrees with Anderson's opinion that the Martini tract would have experienced comparable standing water or flooding prior to the construction of Kirby Drive. Martini bases this argument on the asserted fact that "prior to the construction of Kirby Drive, only a small corner of the Martini tract was encompassed by the 100-year flood plain, and after the construction of Kirby Drive there will be no flow into the storm sewer in a 100-year flood in addition to . . . backup of eight to twelve inches." Martini's expert Duke testified that he relied on FEMA maps to determine the water elevation on the Martini tract in a 100-year flood prior to the construction of Kirby Drive, and that the post-construction water elevation exceeds that level.

Anderson offered a conflicting opinion about the appropriate method of comparison. He testified: "[Y]ou need to know what was the condition at the site in terms of what the flooding risk or flooding level was on the property before anything was done." Anderson testified that he performed multiple different types of modeling to determine the water elevation on the Martini tract in a 100-year flood before the construction of Kirby Drive. He testified that the only way to determine the water elevation in a 100-year flood before the construction of Kirby Drive would be to "actually do the modeling, do the analysis, to come up with the numbers." With respect to Duke's use of the FEMA maps to determine the water elevation on the Martini tract in a 100-year flood prior to the construction of Kirby Drive, Anderson testified that such a method is insufficient:

A. The elevation on the FEMA maps are based on all of the water from the watershed getting into Clear Creek and being ran down Clear Creek in the hydraulic model.

The hydraulic model for Clear Creek gives you an elevation. That water would back up across the site at that elevation, but it does not take into any account how the water got to Clear Creek. **So it's how water gets to Clear Creek that gives you an elevation on the property**.

At oral argument, Martini clarified his argument on appeal and stated that Anderson's method of determining the pre-construction water elevation on the Martini tract utilized the "wrong criteria." This essentially is a direct challenge to Anderson's "underlying methodology, technique, or foundational data," which requires an objection in the trial court to preserve the issue for appellate review. *See Ellis*, 971 S.W.2d at 409. To that extent, Martini has waived this complaint.

Moreover, the trial court was entitled to resolve these conflicting expert opinions in favor of the City. *See Lundy v. Masson*, 260 S.W.3d 482, 492 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) ("The factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony." (citing *City of Keller*, 168 S.W.3d at 819)).[7] We conclude that Anderson's testimony constitutes legally sufficient evidence from which the trial court could have concluded that the construction of Kirby Drive has not negatively impacted drainage from the Martini tract. *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 552 (Tex. 2004) ("If the record contains more than a scintilla of evidence that supports the finding, we must sustain it."). Accordingly, we overrule Martini's Issues 1 and 2.

---

[7] Martini argues that we should apply a de novo standard of review to the trial court's findings on the issue of whether the construction of Kirby Drive negatively impacted drainage from the Martini tract because the resolution of this disputed fact question also resolves the legal question of whether or not a taking has occurred. We reject this argument. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 936 (Tex. 1998) ("[T]he ultimate determination of whether the facts are sufficient to constitute a taking is a question of law, but we depend on the district court to resolve disputed facts regarding *the extent of the governmental intrusion on the property*." (emphasis added)).

12

## II.     Motion for New Trial

Martini argues in Issue 3 that the trial court erred by denying Martini's motion for new trial based on newly discovered evidence regarding a "significant change" to the City's drainage plans that allegedly created a "new and additional impediment" to drainage from the Martini tract after the September 2009 bench trial.  Martini asserts in his motion that "since September 2009," the City has "taken actions to change the drainage flows and structures" that will "affect" the Martini tract, and that "the drainage modifications occurred after the trial and thus could not be discovered prior to trial."

An appellate court reviews a trial court's failure to grant a motion for new trial for an abuse of discretion.  *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).  Every reasonable presumption will be made in favor of a trial court's order refusing a new trial.  *Jackson v. Van Winkle*, 660 S.W.2d 807, 809–10 (Tex. 1983), *overruled on other grounds by Moritz v. Preiss*, 121 S.W.3d 715 (Tex. 2003).  Whether a motion for new trial based on newly discovered evidence will be granted or refused generally is a matter left to the sound discretion of the trial court.  *In re A.G.C.*, 279 S.W.3d 441, 454 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *Jackson*, 660 S.W.2d at 809).  A party seeking a new trial on the ground of newly discovered evidence must show: (1) new evidence has been discovered since trial; (2) the failure to discover the evidence prior to trial was not because of lack of due diligence; (3) the evidence is not cumulative; and (4) the evidence is so material that it probably would produce a different result if a new trial were granted.  *Jackson*, 660 S.W.2d at 809; *In re A.G.C.*, 279 S.W.3d at 453–54.

Martini argues the trial court should have granted the motion for new trial because Martini did not know at the time of trial that North Spectrum Drive later would be built near his property, and this new road "will likely result in an increased drainage problem" on the Martini tract.[8]  According to Martini's motion, the new road "will intersect Kirby

---

[8] Martini also asserts that the City therefore "knowingly presented false testimony regarding the factors which were relevant to the drainage analysis in this case," and that the City presented an

[Drive] a few hundred yards south" of the Martini tract, and "the initial plans" for North Spectrum Road show "underground storm sewers which would collect runoff from adjacent land which is then to be funneled into the storm sewer under Kirby [Drive]." He argues: "The significance of this new road is that, when completed, runoff collected by the storm sewer under [North] Spectrum [Road] will be channeled into the storm sewer under Kirby [Drive,] and in essence create[s] the liquid equivalent of a traffic bottleneck so that the drainage from the [Martini] tract will be impeded by the presence in the storm sewer of the faster accumulating runoff gathered by the [North] Spectrum [Road] storm sewer."

The City responds: "Understanding that Martini's complaints in his motion for new trial were really about alleged new takings claims, the trial court properly denied Martini's motion for new trial, yet specifically stated that the denial did not inhibit Martini from bringing new suits for takings 'as a consequence of new projects, if any.'" We agree. The trial court's judgment, as well as the findings of fact and conclusions of law, resolve the issue of whether the construction of Kirby Drive negatively impacted drainage on the Martini tract, not whether the construction of North Spectrum Drive or any other subsequent construction will negatively impact drainage on the Martini tract. Evidence regarding the latter is not material to the resolution of the former, and the trial court did not abuse its discretion in denying Martini's motion for new trial on that basis. *See In re A.G.C.*, 279 S.W.3d at 453–54. We overrule Martini's Issue 3.

---

"erroneous drainage picture" that "obscured an accurate analysis of the drainage available to the Martini tract and thus misled the Court as to the relevant issue." However, Martini does not explain why the plans for the construction of North Spectrum Drive, before it was built, have any impact on the effect of the construction of Kirby Drive, and he does not cite to any specific testimony he claims to be false.

14

## CONCLUSION

Having overruled all Martini's issues on appeal, we affirm the judgment of the trial court.


/s/ Sharon McCally
   Justice

Panel consists of Justices Frost, Brown, and McCally.