**AFFIRMED; Opinion Filed August 30, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-18-01001-CV

## IN RE THE COMMITMENT OF GREGORY DEVON JOINER

**On Appeal from the 397th Judicial District Court**
**Grayson County, Texas**
**Trial Court Cause No. CV-17-1405**

## MEMORANDUM OPINION
Before Justices Myers, Molberg, and Carlyle
Opinion by Justice Myers

Gregory Devon Joiner appeals the trial court's judgment finding Joiner is a sexually violent predator and civilly committing him pursuant to the Civil Commitment of Sexually Violent Predators Act. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–.153. Joiner brings two issues on appeal contending the evidence is legally and factually insufficient to support the jury's finding beyond a reasonable doubt that he is a sexually violent predator. We affirm the trial court's judgment.

### BACKGROUND

When Joiner was eight or nine years old, he was exposed to pornography depicting rape. Joiner later explained to an evaluator that since that time, "his life has been dominated by masturbating to fantasies of aggravated sexual assault." In 1979, when Joiner was nineteen or twenty years old and living in Arkansas, he had a fantasy of kidnapping a woman, raping her, and brainwashing her to have her fall in love with him. He decided to carry out that fantasy. He leased

an office space, ostensibly for a motorcycle shop, contacted an employment agency to hire a secretary, and he bought some paint and material to make a sign. On Friday, he went to the employment agency and hired the first woman he interviewed. On Saturday, he called her and told her to come into work the next day. On Sunday, when she came to the office, Joiner assigned her the task of making a sign. As she was making the sign, Joiner grabbed and tied her up.

Joiner took the woman into the woods where he raped her. Joiner held her captive for three days, keeping her tied up and raping her repeatedly. He then let her go. He was arrested soon after. Joiner pleaded guilty in Arkansas to kidnapping and rape and was sentenced to five years' imprisonment. Joiner was released on parole after nine or ten months.

After being paroled, Joiner moved to Texas and eventually to Grayson County. Joiner married and had two children. Ten years after the first offense, Joiner put on a mask and broke into his neighbors' house while the husband was away at work and the wife was home caring for her child. Joiner threatened to kill the child unless the woman cooperated. Joiner grabbed her by the hair and forced her into some nearby woods where he raped her. He let her go and went home and waited to be arrested. Joiner pleaded guilty to sexual assault–enhanced and was sentenced to thirty years' in prison. Joiner came up for parole twelve times, and parole was denied every time. During his incarceration, Joiner has had no communication or support from his former wives, his children, or his siblings.

Joiner's mandatory release date was in April 2019. In 2017, the State filed a petition seeking a declaration that Joiner was a sexually violent predator and an order committing him for treatment and supervision. A jury found beyond a reasonable doubt that Joiner was a sexually violent predator. The trial court signed a judgment civilly committing him.

**STANDARD OF REVIEW**

In a suit to commit a person as a sexually violent predator, the State must prove beyond a reasonable doubt that the person (i) is a "repeat sexually violent offender" and (ii) "suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." TEX. HEALTH & SAFETY CODE §§ 841.003(a), 841.062(a); *see also id.* § 841.002(8) (defining "sexually violent offense").

A person is a repeat sexually violent offender if he has been convicted of more than one sexually violent offense and a sentence was imposed for at least one of the offenses. *Id.* § 841.003(b).

A behavioral abnormality is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2).

A predatory act is "an act directed toward individuals, including family members, for the primary purpose of victimization." *Id.* § 841.002(5).

In these cases, we use the criminal test for legal sufficiency. *In re Commitment of Brown*, No. 05-16-01178-CV, 2018 WL 947904, at *8 (Tex. App.—Dallas Feb. 20, 2018, no pet.) (mem. op.). Thus, we review the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the required elements beyond a reasonable doubt. *Id.* It is the factfinder's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts. *Id.*

Although factual-sufficiency review has been abandoned in criminal cases, as an intermediate appellate court with final authority over factual-sufficiency challenges in civil cases, we will perform a factual-sufficiency review in Chapter 841 cases when the issue is raised on

appeal.  *Id.*  In our factual-sufficiency review, we consider whether the verdict, though supported by legally sufficient evidence, nevertheless reflects a risk of injustice that compels a new trial.  *Id.* We view all the evidence in a neutral light and determine whether the jury was rationally justified in finding the required elements beyond a reasonable doubt.  *Id.*  We reverse only if the risk of an injustice is too great to allow the verdict to stand.  *Id.*  The jury is the sole judge of the witnesses' credibility and the weight to be given their testimony.  *Id.* at *9.  The jury may resolve conflicts in the evidence and believe all, part, or none of any witness's testimony.  *Id.*  We may not substitute our judgment for the jury's.  *Id.*

## LEGAL SUFFICIENCY OF THE EVIDENCE

In his first issue, Joiner contends the evidence is legally insufficient to support the jury's finding beyond a reasonable doubt that he is a sexually violent predator.  Joiner does not dispute that he is a repeat sexually violent offender.  Instead, he asserts the State's expert witnesses presented no evidence that Joiner suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.

The State presented the testimony of Dr. Sherri Gaines, a licensed psychiatrist, and Dr. Darrell Turner, a licensed psychologist.  Dr. Turner has performed about 150 or 160 behavioral abnormality examinations, and Dr. Gaines has performed 130 behavioral abnormality examinations.  Both doctors examined Joiner, and they concluded he suffers from a behavioral abnormality that predisposes him to engage in predatory acts of sexual violence.

Joiner argues the doctors' testimony amounts to no evidence because it was conclusory or speculative.  Opinion testimony that is wholly conclusory or speculative amounts to no evidence "because it does not tend to make the existence of a material fact 'more probable or less probable.'"  *In re Commitment of H.L.T.*, 549 S.W.3d 656, 661–62 (Tex. App.–Waco 2017, pet. denied) (quoting *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009)).  Thus, "[b]are,

–4–

baseless opinions will not support a judgment even if there is no objection to their admission in evidence." *Id.* at 662 (quoting *Pollock*, 284 S.W.3d at 816). "When a scientific opinion is admitted in evidence without objection, it may be considered probative evidence even if the basis for the opinion is unreliable." *Id.* (quoting *Pollock*, 284 S.W.3d at 818). "But if no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." *Id.* (quoting *Pollock*, 284 S.W.3d at 818).

Joiner did not object that Turner's and Gaines's opinions were unreliable during trial. Therefore, to prevail on his legal sufficiency claim, he must show in his appeal that the evidence offers no basis to support their opinions. *Id.* (citing *Pollock*, 284 S.W.3d at 817; *In re Commitment of Barbee*, 192 S.W.3d 835, 843 (Tex. App.–Beaumont 2006, no pet.)).

Both doctors testified at length about how they each reached the conclusion that Joiner had a behavioral abnormality that made him likely to engage in a predatory act of sexual violence. They described the risk factors that made it more likely that Joiner would reoffend following his release, and they discussed the positive factors that went against his being a sexually violent predator.

Dr. Gaines and Dr. Turner testified they examined Joiner and concluded he has behavioral abnormalities that make him more likely to engage in a predatory act of sexual violence. They both testified he has an antisocial personality disorder. Besides the sexual offenses, other evidence of Joiner's antisocial personality disorder included his criminal behavior from a young age (he stole a pair of boots when he was eight, stole a car when he was sixteen, and stole gas when he was eighteen), the fact that he ran away from home and hitchhiked across the country at age thirteen, and his unstable employment history, including his inability to complete his Marine Corps service. Joiner was also diagnosed with antisocial personality disorder by the prison doctors.

Additionally, both doctors testified he has sexual deviancy, which Dr. Gaines diagnosed as unspecified paraphilic disorder and Dr. Turner diagnosed as sexual sadism.

Dr. Gaines testified that Joiner's antisocial personality disorder and sexual deviance were the two major risk factors for his reoffending sexually. The combination of antisocial personality disorder and sexual deviancy "is a dangerous combination, and from my knowledge, something that makes someone likely to reoffend, depending on the other things about that person." Dr. Turner testified that "when there's a sexually deviant interest and there's a degree of antisociality, it acts as a fuel that allows them to act on that sexually deviant interest and victimize other people because they're so antisocial that they're okay with doing that."

Both Dr. Gaines and Dr. Turner testified to Joiner's minimization of his offenses. In describing the first offense to the doctors and in his testimony at trial, Joiner testified that the first sex he had with the victim was nonconsensual, but that the sex they had after that over the next three days was consensual and sometimes initiated by the victim. The doctors testified Joiner's description of this offense fit his fantasy of brainwashing the victim to have her fall in love with him. Dr. Gaines testified Joiner's description of the offense was "entirely implausible"; Dr. Turner testified it was Joiner's "actual fantasy" and his "sexually deviant belief." They testified Joiner also minimized the second offense. In that offense, he grabbed the victim's hair at the back of her head and forced her out of the house. When Joiner testified about the offense at trial, he minimized his actions by stating, "I placed my hand behind her hair, like this, and I led her down the hallway through the living room out the back door." Dr. Gaines testified that Joiner's version of the events shows he is unaware of the harm he caused the victims, and Dr. Turner testified it demonstrated his antisocial personality disorder.

Both doctors testified Joiner's lack of sex-offender treatment was a risk factor for his reoffending. Dr. Gaines testified that sexual deviancy is a chronic condition that lasts a person's lifetime. There is no medication for sexual deviancy.

> The treatment for deviant sex is sex offender treatment. There's very specific sex offender treatment to focus on sexual deviance. This is cognitive behavioral treatment usually. So it helps the person examine their thoughts, helps the person examine triggers, helps the person examine cycles, helps the person examine how their unhealthy thoughts can lead to unhealthy behaviors.

Dr. Gaines testified Joiner needs sex-offender treatment.

Although Joiner received psychological counseling in prison for several years where he discussed the offenses, he received no formal sex-offender treatment. Joiner testified he never requested sex-offender treatment because the State did not provide sex-offender treatment on request but would make the decision whether to place an inmate for sex-offender treatment. Both Dr. Gaines and Dr. Turner testified this was not true. Dr. Turner testified he asked Joiner if he wanted sex-offender treatment, and Joiner said he wanted it so he could understand "why sex played such a big portion in my life." Dr. Turner testified this response showed Joiner was "not really getting what the problem is. The problem is that he abducted and raped two women, not that sex is important to him." Dr. Gaines testified Joiner "still does not understand his offending, he still does not understand how his offending affected his victims. He still does not understand what led to his offending. He still has a fantasy version in his head of what actually happened."

At trial, Joiner testified that the halfway house to which he wants to go when he is released does not provide sex-offender treatment. He testified he does not need sex-offender treatment to avoid reoffending "because I've made up my mind that I'm not going to reoffend." He testified he "could use sex offender treatment so that I can reinforce the laws that I'm not going to do this ever again, plus I can help other people in the process."

Besides Joiner's sexual deviancy, antisocial personality disorder, his present minimization of the offenses, and his lack of sex-offender treatment, the doctors listed other risk factors for his reoffending, including his use of violence to commit the offenses, the planning involved in committing them, the extended length of time of the first offense, the fact the victims were not family members, and the lack of family support.

The doctors testified they also considered positive or protective factors, including Joiner's age (he was sixty years old at trial), his obtaining his GED, his institutional adjustment and good behavior in prison, his participation in behavioral and other programs in prison, his participation in a faith-based program, and the rationality of his post-release plan.

Dr. Turner testified he administered "actuarials" to Joiner, including the Static-99R and the PCL-R. The Static-99R indicates the likelihood of a sexual offender reoffending considering "ten variables that have been shown to be associated with a sex offender being arrested for a subsequent sex offense." Dr. Turner testified the Static-99R was not meant to be an exhaustive list of considerations for risk of recidivism by a sex offender. Joiner had a score of "1" on the Static-99R, which indicates an average likelihood of reoffending. The PCL-R consists of twenty items that are common among persons considered psychopaths. Dr. Turner scored the PCL-R for Joiner twice, once after interviewing him and reviewing limited records and again after reviewing more complete records concerning Joiner. Dr. Turner testified the average male with no criminal history would score 5 to 8, while the average inmate would score 22 or 23. A score of 26 to 30 indicates a high degree of psychopathic characteristics. The first time, Joiner's score was 15, which Dr. Turner stated is not "anywhere near psychopathic range." The second score was 21, which does

not indicate psychopathy. Dr. Gaines and Dr. Turner testified the actuarials do not take into consideration all factors necessary to determine a person's likelihood of reoffending.[1]

Joiner argues that the doctors' consideration of his denial or minimization of the offenses as a risk factor "has been resoundingly discredited as a risk factor." The evidence at trial concerning denial or minimization of an offense as a risk factor for reoffending was the following testimony by Dr. Gaines:

> Q. In terms of risk factors, is denial considered a risk factor by individuals you're seeing?
>
> A. There are some papers that have been able to correlate it and some papers that have not been able to correlate it. However, where I'm coming from is that the treatment of cognitive behavioral therapy depends on someone being able to admit their mistake in order to start working on it. So, to me, that makes it clearly a risk factor.

Dr. Turner testified about denial as follows:

> Q. . . . [Y]our testimony in this case was that denial is not a risk factor; isn't that correct?
>
> A. Correct. . . . [M]y testimony is that denial in and of itself was shown in the research not to be predicative of reoffending.
>
> Q. . . . So, it's true that denial is not a predictor of whether or not a person is going to reoffend or not.
>
> A. I no longer hold that view. I mean, we grow and we read and learn and we continue our training. I think that it matters, as Dr. Gaines said, because it speaks directly to their likelihood of good prognosis and treatment. It's also one of the PCL-R items, so it factors into that score and antisociality. But if you just took denial by itself, it's like if you just took one of 500 questions off an intelligence test, that one is not going to be very predictive of how smart someone is.

---

[1] Dr. Gaines testified,

Q. . . . [C]ould you give the jury an example of something that you considered very important in this case that is not captured on this instrument [Static-99R]?

A. Sure. So the fact that his sexually deviant fantasies were so strong and so important in his life they have been present since the age of eight or nine and he had been dominated by—his life had been dominated by masturbating to these fantasies of rape, brainwashing, kidnapping, and then he actually goes out and conducts one of these offenses, he's incarcerated, gets out, he conducts another offense, and statements that he made to psychologists, such as, you know, he views women as wild game, and so that's why he takes them into the woods to bring them back to their home, he likes to stalk women like he stalks wild game, none of this is accounted for on the Static-99. And these statements and these types of fantasies are extremely important in conducting a risk assessment, as they speak to sexual deviance, antisociality, so on and so forth.

Q. . . . [I]t's true, isn't it, Dr. Turner that Mr. Joiner has not denied committing these offenses; is that right?

A. Well—and that's another problem with it, and that's one reason why I know [sic] longer hold that view, is because there are different stages of denial, there are different types of denial. There's outright denial, there's minimization, there's blaming the victim. There are different things of that nature. And so, I wouldn't say that he's not denying his offenses. He's admitting to sexually assaulting the victims, but to turn around and then say that it was consensual, but then admit that he had her tied to him, that's not—

The record does not show minimization of offenses "has been resoundingly discredited as a risk factor." Instead, the evidence shows that minimization and denial are factors to be considered in determining whether an offender is a sexually violent predator. Joiner also argues Dr. Gaines's testimony was conclusory and speculative because she emphasized denial as a risk factor during her testimony. The evidence in this case was that denial is a risk factor.

Joiner attacks a statement made by Dr. Gaines about why there is a discrepancy in research papers about whether an offender's denial of an offense is a risk factor. Dr. Gaines testified:

These are, again group statistics, and oftentimes people who have been studied have had sex offender treatment. Oftentimes they have realized that they need to admit to their crime, so that's kind of a confounder that someone may be able to say that they committed a crime that might skew the research.

Joiner appears to argue Dr. Gaines meant that people who have been in sex offender therapy know they have to admit to the offense and that they do so even though they are in denial. Thus, for statistical purposes, they are not counted as being in denial even though they are, and any reoffending by them is not counted as reoffending by a person in denial. Joiner argues this statement is baseless because "[c]oerced admissions would mean that there are innocent people mixed in with the admitted sex offenders and would actually *increase* the correlation between admission of crimes and not re-offending . . . ." Nothing in Dr. Gaines's statement indicates she included innocent people. Nothing in the evidence shows innocent people admitted to sexual offenses they did not commit. Joiner's criticism is not valid.

Joiner argues the testimony about his lack of family support being a risk factor is incorrect. Joiner cites articles in periodicals that he asserts stand for the proposition that lack of family support is not a risk factor for reoffending when the person has a support network consisting of volunteers in faith-based organizations. These articles or similar evidence were not offered or admitted into evidence at trial, so we cannot consider them.

Joiner argues "there is no scientific basis provided to support that sex offenders who planned their crimes are more likely to reoffend than those who do not plan their crimes." Dr. Gaines testified that the planning involved in the offenses was part of the sexual deviancy, which the doctors testified was a major risk factor.

Joiner appears to argue the first offense was not as bad as the doctors suggested because he received only a five-year sentence for that offense and he was released on parole after nine or ten months. The record contains no evidence of the reason for the length of the sentence in the first offense or for the timing of the parole. Joiner's suggestion that the length of the sentence or the granting of parole shows the offense was not a heinous offense and a horrific, terrifying ordeal for the victim is speculation, not evidence.

Joiner argues that Dr. Gaines had no basis for her statement that Joiner's description of the first offense as involving consensual sex after the first sex was "entirely implausible." Dr. Gaines testified the records for the offense "indicate that he sexually assaulted her on more than one occasion," that the victim "reported the offenses as soon as she was freed," and "that she was nonconsenting." Thus, the records provided Dr. Gaines a basis for her statement.

Joiner argues Dr. Gaines's testimony was not based on evidence or grounded in science because she testified that the facts of the offenses "help me to identify things that I know from my fund of knowledge that would make him more likely to reoffend." Joiner asserts Dr. Gaines has no "fund of knowledge" because her practice does not include sexual offender therapy. However,

her practice includes regularly working with people who have issues with sexuality. She also testified she had worked for three years as a prison psychiatrist where her practice included work with sexual offenders. Her testimony included references to research that certain facts indicate a likelihood of reoffending. Thus, the record shows she had a fund of knowledge.

Joiner also criticizes Dr. Gaines's knowledge, asserting she lacked knowledge of research from the last decade, including that the MSAS actuarial was discredited. There is no evidence that the MSAS actuarial has been discredited. The only evidence about the validity of the MSAS was Dr. Turner's testimony that as new versions of the MSAS become available, the older versions are no longer used. Dr. Turner testified he does not use the MSAS because it and the Static-99R "are essentially getting at the same thing." He did not testify that the MSAS had been discredited or was invalid.

Joiner also asserts Dr. Gaines "invent[ed] risk factors that have not been studied and imbue[d] them with scientific significance." Joiner argues Dr. Gaines testified that Joiner's taking his victims into the woods had significance over and above the observation that offenders whose crimes involved actual or threatened force were more likely to reoffend. Dr. Gaines made no such statement. She first testified that the prison psychologist recorded the fact that Joiner's thought process leading to him reoffending was that he hunted down his victims and took them into the woods and that his sexual pleasure increased the more the women fought him. She later agreed with a statement by Joiner's counsel that his taking the first victim into the woods and spending three days with her was a risk factor. Dr. Gaines did not testify that the force used by Joiner in these offenses was a more significant risk factor than the use of other kinds of actual or threatened force.

Joiner criticizes Dr. Turner's testimony that Joiner "admitted to evaluators that he's fantasized about kidnapping a woman, brainwashing her, raping her, she immediately falls in love

with him, they live happily ever after" and that "this is still how he thinks about that first offense." Joiner asserts there is no evidence to support the statement Joiner still thinks about that first offense that way. Joiner points out he was evaluated at the Skyview facility, but he left that facility in 2001. He asserts that Dr. Gaines did not testify that he told her that he thought about the offense that way, and no evaluators examined him after Dr. Turner. Joiner argues that no evidence supports Dr. Turner's statement that "this is still how he thinks about that first offense." Dr. Turner testified that Joiner had "future interviews . . . after my evaluation with him," so Joiner's assertion that no one interviewed Joiner after Dr. Turner is incorrect. Also, Dr. Gaines testified that Joiner told her about that fantasy and that his statements showed he still believes it:

> On my interview with Mr. Joiner, as well as my knowledge from reading the records, Mr. Joiner had a rape fantasy. He had a fantasy to kidnap someone, sexually assault them, and then brainwash them. So this appears to be what he intended to do with his victim . . . and what a part of his brain is still telling him that he did, that at some point she became a consenting victim, which is entirely implausible.

Moreover, Joiner's testimony at the trial was that much of the sex in the first offense was consensual and sometimes initiated by the victim. Thus, both Dr. Gaines's testimony and Joiner's own testimony support Dr. Turner's statement.

Joiner also argues that his fantasies were fourteen to twenty years old. However, both Joiner's own testimony and the testimony of Dr. Gaines and Dr. Turner indicate he still believes in his fantasized version of the first offense.

Joiner also points to the differences between the two offenses and the fact that the second offense was a violent sexual assault with no attempt to win over the victim or to keep her with him. Joiner argues,

> The absence of any pretense that the second victim was anything other than a flat out assault begs the question of why, if his mistaken notion that the first victim acquiesced in the sex after the initial rape is so pervasive as to be considered a behavioral characteristic forty years later, and this characteristic is so dangerous

and predictive of re-offense that Mr. Joiner continues to be a menace, it played no part in the circumstances when he did re-offend.

The doctors did not testify that Joiner would attempt to recommit the first offense. Their testimony was that Joiner had sexual deviancy in the form of unspecified paraphilic disorder or sexual sadism from his sexual fantasies of raping women. Joiner told an evaluator in prison that he was first exposed to pornography depicting rape when he was eight or nine years old, and "his life has been dominated by masturbating to fantasies of aggravated sexual assault since that time." Thus, the testimony demonstrates that Joiner's sexual fantasy was raping women, and the fantasy of having the woman fall in love with him was but one manifestation of the fantasy of raping women. Dr. Gaines also testified that a prison psychologist noted that Joiner's sexual pleasure increased the more the victim fought with him. The second offense of a violent rape was in line with Joiner's sexual fantasy of sexually assaulting nonconsenting women.

Joiner also points out that Dr. Turner's testimony that Joiner's "fantasy life is a huge– cannot be overstated as a huge, huge risk factor here" conflicts with Joiner's testimony and his statements to the doctors that he has not had any sexually violent fantasies in at least twenty years. Dr. Turner addressed whether Joiner still has sexual preoccupation:

> [I]n the last ten years it's difficult to find evidence of him being sexually preoccupied because he's in an all-male facility. There's clear evidence of sexual preoccupation and promiscuous sexual behavior prior to his incarceration. But in the last ten years, I think that the best evidence of it is his description of the offenses, the way that—his description of the offenses and victims' reaction and behavior is still very, very similar to what his sadistic fantasies have been since he was a small boy. So that would be—that would be primary of it.
>
> . . . .
>
> Because he has a history of sexual preoccupation, and I think the fact he's still saying that it [the first offense] was consensual after 20 minutes and all of these other things, I think he's still active in that fantasy world.
>
> . . . .
>
> [I]f he's still active in his deviant sexual fantasy world, then I think he's sexually preoccupied.

Dr. Turner's testimony shows Joiner is still sexually preoccupied despite Joiner's testimony to the contrary. Joiner's argument lacks merit.

Joiner also points to evidence presented in another case that "maybe up to 75 percent of people in jail or prisons are antisocial" but only "'like 20 percent or so' of the criminal population have psychopathy 'or at least strong psychopathic traits.'" *In re Commitment of Stoddard*, No. 02-17-00364-CV, 2019 WL 2292981, at *7 (Tex. App.—Fort Worth May 30, 2019, pet. filed) (mem. op.). We cannot consider evidence that was not before the trial court. Moreover, the issue is not whether Joiner has antisocial personality disorder (the evidence shows he does) or whether he is psychopathic (the evidence shows he is not). The issue is whether he has such a behavioral abnormality *and* is likely to engage in a predatory act of sexual violence. *See* HEALTH & SAFETY § 841.003(a)(2); *In re Commitment of Bohannan*, 388 S.W.3d 296, 303 (Tex. 2012) ("whether a person 'suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence' is a single, unified issue" (footnote omitted)). The fact that his level of antisocial personality disorder may be the same or just below that of the average inmate is also not the issue. As Dr. Turner testified, there are many antisocial people who may be criminals but who do not have sexually deviant interests. Viewing Joiner's level of antisocial personality disorder without considering his sexual deviance is not relevant to the question of whether the evidence supports a finding beyond a reasonable doubt that Joiner is a sexually violent predator.

Joiner also argues Dr. Gaines's and Dr. Turner's opinions should not be considered because they are "too dependent upon [an expert's] subjective guesswork." *In re Commitment of Bohannan*, 388 S.W.3d at 305–06. We disagree. The doctors described the basis for their decisions and the data and evidence on which those decisions were based. Their decisions were not "too dependent upon . . . subjective guesswork."

–15–

After reviewing all the evidence in the light most favorable to the verdict, we conclude a rational juror could have found the required elements beyond a reasonable doubt. Therefore, the evidence was legally sufficient to support the jury's finding that Joiner was a sexually violent predator. We overrule Joiner's first issue.

## FACTUAL SUFFICIENCY OF THE EVIDENCE

In his second issue, Joiner contends the evidence is factually insufficient to support the jury's finding that he is a sexually violent predator. We must determine whether the verdict, though supported by legally sufficient evidence, nevertheless reflects a risk of injustice that compels a new trial. *In re Commitment of Brown*, 2018 WL 947904, at \*8.

Joiner argues the evidence is factually insufficient because his two offenses "hardly constitute 'a history of multiple sexual offenses over an extended period of time' or a pattern of well-ingrained offending behavior," quoting *In re Commitment of Stoddard*, 2019 WL 2292981, at \*12. Joiner argues his two offenses are "hardly a 'pattern of violent offenses,'" quoting *Stoddard*. *Id.* at 14. Joiner committed two aggravated sexual assaults against female victims over ten years. After that, he was imprisoned for thirty years with no opportunity to commit sexual assault against women. The fact that ten years intervened between the two offenses does not make unjust the jury's determination that he suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Joiner points out that in *Stoddard*, the court of appeals determined the evidence was factually insufficient, and the defendant in that case had more than two offenses. *See id.* at \*1 (Stoddard had two convictions but many incidents of aggravated sexual of assault of children under fourteen). The statute defines "sexually violent predator," in part, as "a repeat sexual offender." With his two convictions, Joiner is a "repeat sexual offender." To find the evidence factually insufficient because he did not have more than two sexual-assault

–16–

convictions would constitute adding an element to the sexually violent predator statute, which courts may not do.

Joiner also argues his first offense was not heinous because he received a sentence of only five years' imprisonment and was released on parole after only nine or ten months. As we discussed in Joiner's first issue, the record contains no evidence of the reason for the length of Joiner's sentence in the first offense or for the granting of parole. Any suggestion that the sentence and parole were based on the lack of heinousness of the offense or any other reason would be speculation. Such speculation is not evidence and will not be considered by this Court. Absent expert testimony to the contrary, the length of the sentences and the relative heinousness of the underlying offenses are not relevant to whether the defendant meets the statutory definition of sexually violent predator.

Joiner also argues that because he was deterred for ten years following his first imprisonment, "it is ridiculous to assume . . . he would be a 'menace' undeterred by the experience of a thirty year period of imprisonment if released." Again, that is not the issue. The issue is whether he meets the definition of sexually violent predator, not whether the experience of incarceration may have had a deterrent effect. The fact that he served thirty years in prison does not make the evidence that he is a sexually violent predator factually insufficient.

Joiner also argues it is "ridiculous to presume Mr. Joiner is incapable of controlling himself to the extent that he is a menace to society." Joiner points out he did not commit a sexual offense until he was twenty-one years old, and there were no offenses for at least nine years after his first release from prison. Joiner's two offenses form the factual basis for the element of being "a repeat sexually violent predator." The fact that Joiner was imprisoned before he could commit more offenses does not make the jury's finding that he is a sexually violent predator unjust.

The evidence shows Joiner committed two violent sexual offenses. After being imprisoned for thirty years, Joiner still has antisocial personality disorder and sexual deviance. He did not request or receive sex-offender treatment while imprisoned, and his plan for his release did not include sex-offender treatment. The doctors testified these were major risk factors for his reoffending.

After reviewing all the evidence in a neutral light, we conclude the risk of an injustice in this case is not so great as to require a new trial. Therefore, the evidence is factually sufficient to support the jury's finding that Joiner is a sexually violent predator. We overrule Joiner's second issue.

**CONCLUSION**

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

181001F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

IN RE THE COMMITMENT OF
GREGORY DEVON JOINER

No. 05-18-01001-CV

On Appeal from the 397th Judicial District
Court, Grayson County, Texas
Trial Court Cause No. CV-17-1405.
Opinion delivered by Justice Myers.
Justices Molberg and Carlyle participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

It is ordered that each party bear its own costs of this appeal.

Judgment entered this 30th day of August, 2019.