In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-23-00351-CV
_____

IN RE COMMITMENT OF BRYANT OLIVER TUTTER

On Appeal from the 359th District Court
Montgomery County, Texas
Trial Cause No. 22-10-13793-CV

**MEMORANDUM OPINION**

A jury unanimously found beyond a reasonable doubt that Bryant Oliver Tutter is a sexually violent predator pursuant to the Sexually Violent Predators Act ("SVP Act"). *See* Tex. Health & Safety Code Ann. §§ 841.001-.153. As a result, the trial court civilly committed him for sex-offender treatment and supervision. Tutter challenges the sufficiency of the evidence to support a finding beyond a reasonable doubt that he has a behavioral abnormality that makes him likely to engage in a

1

predatory act of sexual violence. Having reviewed the record and the arguments asserted, we affirm the trial court's judgment and order of commitment.

Background

In 2022, the State petitioned to civilly commit Tutter under the SVP Act, which permits commitment of individuals upon a finding that they (1) are a "repeat sexually violent offender" and (2) suffer "from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." *Id.* § 841.003(a). Tutter filed an answer denying the State's allegations.

At trial, the State presented testimony from Dr. Michael Arambula, a clinical and forensic psychiatrist. After detailing his training and experience in sex-offender risk assessment, Arambula described how he met with and evaluated Tutter for the purpose of determining whether he suffers from a behavioral abnormality that would subject him to civil commitment under the SVP Act. Arambula explained that when conducting a behavioral abnormality evaluation, he first reviews any records that are sent to him and then conducts a general psychiatric examination followed by a forensic psychiatric evaluation. Arambula confirmed he followed this methodology in evaluating Tutter and arriving at his opinion that Tutter suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.

2

Arambula explained that risk factors are "elements in someone's history that have been researched looking at the population of individuals[]" that are "based on statistical findings." He further explained that according to research, there is a causal relationship between the seriousness of one's condition and the risk of recidivism. According to Arambula, the "heaviest" risk factor looks at the number of victims and number of incidents. Tutter had four sexual offense convictions, but numerous allegations which occurred over the years. The second risk factor is the degree of someone's antisocial personality. Tutter's sexual deviance involved children. Arambula also identified other risk factors for Tutter, which included reoffending after treatment, a serious issue with alcohol at the time of his offenses, and the degree at the time of his arrest of lack of responsibility, blaming the victims, and denial.

Arambula diagnosed Tutter with pedophilia, unspecified personality disorder with some antisocial features, and alcohol abuse that has been in remission due to Tutter's incarceration. Arambula explained that to be diagnosed with pedophilic disorder, an individual has an interest, fantasies, and/or has engaged in activity with children that are generally thirteen and younger, the condition has persisted at least six months, and the condition causes clinically significant impairment of distrust. Arambula testified Tutter meets all the criteria, even though Tutter didn't admit to having these types of sexual fantasies during Arambula's evaluation. According to

3

Arambula, Tutter's diagnosis for pedophilia relates to his behavioral abnormality because of the chronicity and the number of victims. Furthermore, there is a statically high risk for recidivism when children are involved. Arambula testified that while Tutter's chronic pedophilia doesn't go away, it can be managed and treated.

Arambula explained that an unspecified personality disorder with antisocial features is a diagnosis where there are some, but not all, criteria for an antisocial personality disorder. Arambula did not diagnose Tutter with antisocial personality disorder because that diagnosis requires evidence of a history of conduct disorder prior to reaching adulthood, and he had no evidence of that. Antisocial features include lack of responsibility and lack of remorse. In determining that Tutter had antisocial features, Arambula looked at a mental health evaluation administered by psychologists in which Tutter scored somewhat high on specific aspects of antisocial personality. Along with sexual deviance, antisocial personality tends to aggravate the risk for sexual recidivism.

Arambula testified that Tutter made statements indicating he was under the influence when he abused his biological daughter and his stepdaughter. Although Arambula explained substance abuse aggravates the future risk of sexual recidivism, he did not consider Tutter's alcohol abuse in determining whether Tutter has a behavioral abnormality because of the length of Tutter's incarceration; instead, he

4

focused on the seriousness of Tutter's sexual deviance and the number of victims and incidents. An additional factor Arambula accounted for in determining Tutter's risk factors is a cognitive screen which showed Tutter has a mild cognitive impairment. This impairment, according to Arambula, could raise the issue of disinhibition.

The evidence admitted at trial shows that Tutter has four convictions for sexually violent offenses: three convictions for indecency with a child and one conviction for aggravated sexual assault of a child. Regarding the first conviction, Arambula testified that Tutter sexually assaulted his six-year-old biological daughter Michelle.[1] Arambula explained that his daughter reported that Tutter removed his clothing and her clothing and fondled her in bed. There were also allegations of attempted sex. Arambula testified that the records indicate that Tutter didn't accept responsibility for his actions and failed to acknowledge his actions could have harmed Michelle. For this incident, Tutter was convicted of indecency with a child and received a ten-year probated sentence. His probation was later revoked because

[1]We refer to the victims referred to in the opinion using pseudonyms to protect their identities. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

5

of allegations of recurrent sexual misconduct and a failed polygraph that Tutter agreed to take as part of his probation. He was then sentenced to ten years in prison.

Arambula identified several risk factors associated with Tutter's first conviction. First, Tutter's denial and minimization of the offense is a risk factor because research shows that it is a sign and symptom of sexual deviance. Next, Tutter's failure to complete probation aggravates the risk for future recidivism as he repeated sexual misconduct while under supervision. Last, Arambula explained the risk factor with this offense is that Tutter committed it against his own six-year-old daughter.

Arambula testified that Tutter's next victim which resulted in a conviction was his stepdaughter, Teresa.[2] According to the records, Teresa reported that Tutter fondled her almost every evening for a couple of years beginning at age ten. Tutter progressed to digital penetration of her vagina, culminating in attempted penile penetration when she turned fourteen. Tutter told Arambula that he may have touched Teresa once, but he couldn't remember everything because he tried to block it out. Arambula found Tutter's response significant because despite Tutter's knowledge of what happened, the sexual activity still went on.

---

[2]A pseudonym.

Arambula highlighted the following details from Tutter's series of offenses against Teresa: (1) the length of time the fondling occurred; (2) Teresa's family moved away, which is a dynamic risk factor to avoid being caught or investigated further; and (3) Teresa tried to scream during the attempted sex, but Tutter placed his hands over her mouth, injuring her lip. Arambula acknowledged that Tutter demonstrated "some" insight into his sexual misconduct toward Teresa in that he learned that he mixed love for Teresa with sex. Arambula noted Tutter did not express any details of his offense cycle and triggers so that he could better manage his condition.

Arambula also considered allegations of sexual offenses for which Tutter was not prosecuted. These incidents involved four victims: his stepson, a different stepdaughter from his first marriage, his niece, and Teresa's cousin Caroline.[3] Tutter's psychiatric records indicate that he reported struggling with sexual attraction to children a few years before 1982 and 1983. Tutter also sexually molested his stepson and a different stepdaughter which led to the separation from his wife at the time. Additionally, Tutter admitted in an evaluation that he had sex with his niece who was around ten or fourteen years of age when Tutter was seventeen. Arambula found it significant that in his deposition, Tutter suggested his

_____

[3]A pseudonym.

7

niece initiated sexual contact with him because it infers that the young girl is the aggressor and Tutter acts like a victim, "just let[ting] it happen." Arambula testified that Tutter's attitude toward this sexual misconduct was concerning because, although Tutter was "making decent progress [in] treatment," "there were some big holes that were still there." Moreover, Caroline made allegations against Tutter that he tried to fondle her under her underwear.

Arambula explained that he did not give these additional allegations the same weight as Tutter's convictions in accordance with his training but noted these allegations "occurred in the same time span that all of his sexual misconduct came under scrutiny." He noted Tutter conceded that the allegations were true but was defensive. According to Arambula, these accusations are concerning in relation to Tutter's risk of reoffending because the more victims an individual has, the higher the risk of recidivism. Arambula said that in Tutter's case, "there are probably too many [victims] to count."

As part of his evaluation, Arambula reviewed several psychological assessment tools administered by other treatment providers. One of those tools is the Static-99R, which is a test that measures a person's risk of reoffending based on certain risk factors as compared to other sex offenders. Tutter scored a negative one on the Static-99R, which Arambula presumes is in the very low risk category.

8

Arambula also reviewed Tutter's results from the PCL-R, which is a test that determines whether an individual is a psychopath. Tutter scored a twenty on the test. A score of thirty is the traditional score that indicates that someone is a psychopath. Based on Tutter's score of twenty, Arambula inferred that Tutter is not a psychopath.

Arambula identified several protective or positive factors for Tutter. Arambula explained that protective or positive factors "are those same risk factors that research has shown aggravate the risk of recidivism. But when they're not present, then they're for the most part, neutral." Tutter's positive or protective factors include (1) steady employment prior to prison despite Tutter's alcohol issues; (2) lack of misbehavior and disciplinary history in prison; (3) completion of technical classes to improve job skills; (4) obtention of degrees; (5) participation in music ministry, online Bible college, prison choir and spiritual activities; (6) acceptable progress in a sex offender treatment program ("SOTP"); (7) lack of significant non-sexual related criminal history; (8) no extra familial or stranger victims; (9) completion of his GED; and (10) no sexual misconduct cases while in prison.

Because Arambula classified Tutter as a pedophile, his advanced age "doesn't carry much weight" as a positive or protective factor, according to Arambula. Arambula noted that Tutter has lost contact with a significant part of his family apart

9

from a niece and his sister. Arambula is concerned that Tutter has plans to be around children when he gets out of prison because it shows Tutter's denial as well as constituting a risk to be around children.

Arambula noted that Tutter received sex offender treatment after his first conviction for sexually abusing Michelle. Even though Tutter reported he successfully completed that treatment, he sexually offended against Teresa while undergoing treatment. There were additional victim accusations from that time period as well. Arambula explained how Tutter's actions are concerning as research shows that if an individual has received treatment and recidivates while in treatment or afterwards, it can aggravate that person's risk for recurring sexual misconduct. Even in his most recent completion of SOTP, the progress notes indicate that Tutter is in denial and that "he feeds to people what they want to hear." Arambula believes that this treatment progress is not enough to prevent Tutter from reoffending.

Another concern observed by Arambula is Tutter's denial that he is sexually attracted to children. Arambula explained that denial is equivalent to someone having "blind spots or blinders[.] [I]f they don't accept responsibility, which is one of the first obstacles in treatment, then they don't know what to manage or how to manage it because they don't acknowledge that it's even there." Furthermore,

10

Arambula identified Tutter's thinking errors as problematic because Tutter "has continually denied that he offended against his daughter much less hurt her."

When Tutter testified at trial and addressed his criminal history and the sexual assault allegations against him, Tutter acknowledged that in 1977, prior to turning eighteen, he had inappropriate sexual contact with his ten-year-old niece. He claimed that he was trying to have sex with his niece when his wife walked in but that they never had sex. He testified that his niece was on top of him and that his niece tried to put his penis inside of her. Tutter claimed that his niece wanted to have sex just as much as Tutter did. Although at the time of the incident Tutter did not believe he was engaging in sexual abuse of a child, today he believes he did.

Tutter testified that at around the age of twenty-four, he was hospitalized at Rusk State Hospital. He denied he was hospitalized due to the depression caused by the loss of his family due to sexually offending against his stepson and stepdaughter, but explained he was hospitalized after trying to commit suicide after his wife left him. He denies telling Rusk staff that he engaged in sexual activity with his stepson and stepdaughter; rather, he told the Rusk staff what they wanted to hear so they would discharge him. Tutter denied abusing either of his stepdaughters. He explained that while his wife was in the hospital, he gave his stepson a bath and his stepson claimed that Tutter "hurt him down there."

11

Tutter testified that while hospitalized at Rusk, he did not have an obsession or drive for the sexual relationship with children. Rather, it developed later at around age twenty, prior to his convictions. He admitted he still struggles with the sexual attraction of children today.

When Tutter turned to his conviction of sexually assaulting Michelle, he agreed that he offended against Michelle three years after his hospitalization at Rusk but did not characterize it as sexual abuse. Tutter explained that prior to the offense against Michelle, he and his wife separated and were living apart. Michelle lived with her mother and would visit Tutter. Tutter denied removing all of his clothes and all of Michelle's clothes when she spent the night at Tutter's house. He further denied trying to penetrate her vagina with his penis. Instead, Tutter said that Michelle woke Tutter up crying, needing to use the bathroom. Tutter took her to the restroom, pulled down her panties, and placed her on the toilet. According to Tutter, Michelle told him her "pee-pee was hurting." Tutter rubbed petroleum jelly on it just as his sister walked in the door yelling, "What are you doing? You're molesting your daughter."

At the time of the incident, Tutter denied telling the police that he was in Rusk three to four years prior for the same problem with his stepchildren but that he had been able to control the situation since that time. Rather, Tutter believed he was in

control of the situation with Michelle. He did not recall saying he had been fighting a sickness for years, but he believed other people viewed it that way.

For the offense against Michelle, Tutter took a plea bargain and pleaded guilty to the offense of indecency with a child. He received a ten-year probated sentence. While on probation, he successfully completed sex offender treatment even though he sexually offended against Teresa while in the program. After a jury trial in which he was found guilty of sexually assaulting Teresa, his probation was revoked, and he was sentenced to prison for ten years. He claimed he didn't remember telling parole that the reason he offended against Michelle was that he was "looking for love" and "just not getting it."

When Tutter testified to his conviction of sexually assaulting Teresa, he said that he was alone with her on five or six occasions when he was teaching her how to drive. He admitted to touching her legs and breasts inappropriately. He also tried to have sex with Teresa by talking her into it and touching her, which he agreed was sexually inappropriate. Tutter also admitted he tried to penetrate her vagina with his fingers. After taking Teresa out of school to go driving, Tutter tried to sexually abuse her. The sexual abuse occurred on more than one occasion.

In another incident with Teresa when she was ten years old, Tutter admitted that he entered her room and rubbed her vagina and breasts although he claimed not

to remember the entire incident. When Teresa was eleven, Tutter admitted to penetrating her vagina with his finger, but again testified that he couldn't really remember the incident. Tutter testified that he couldn't recall if there was an incident when Teresa was fourteen or fifteen where he pulled off her pants and rubbed his penis on her vagina, although he did remember recalling this incident in his deposition. Tutter admitted when he tucked Teresa in bed, he kissed her inappropriately because he French kissed her on the lips. At the time he thought he was showing Teresa "fatherly love," but today realizes that he was not demonstrating fatherly love.

Tutter admitted to abusing Teresa once a month for a couple of years. He now understands what he did to Teresa was abuse. According to Tutter, Teresa saved his life because it put him in prison until he was better.

Regarding the sexual abuse against Caroline, Tutter testified that he "might have rubbed her leg, putting a cover up on her" but did not admit to "go[ing] inside of her panties[.]" Tutter recalled that after he covered her and touched her, Caroline ran to her grandmother's house.

Tutter testified that he has engaged in several self-help programs in prison, including Kairos, Making Peace with Your Past, Recovery Ministry, Bridges to Life, Voyager, and Cognitive Intervention. From these classes, he has learned about

14

forgiveness, victim empathy, taking responsibility for one's actions, and setting long-term and short-term goals to help himself from reoffending. Tutter's short term goals are (1) to get out and stay out of prison; (2) to find a church group; (3) to attend AA meetings; and (4) to find family members who will support him. His long-term goal is to purchase property to leave to his children. Tutter feels that he has applied the lessons from the programs to himself and now believes he has a choice for his actions, whereas in the past he was in denial and out of control sexually. Tutter agreed that he learned in treatment that he always had control. After he is released from prison, Tutter plans to minister to other prisoners.

Tutter recently completed a sex offender treatment program, although it was a requirement by parole to be released from prison. From this program, Tutter learned about his triggers, what causes his triggers, his thinking errors, and his sexual deviance responses. He believes he has received all the necessary tools from the program to prevent himself from reoffending sexually and that he does not need more sex offender treatment.

Tutter recognizes that being alone with children is a high-risk situation for him today. He believes that the only people that were in danger were his family members and acknowledges that his family members do not trust him with their children. Although he shouldn't be trusted with children because he is a convicted

sex offender, Tutter believes children are safe around him, "but it's better not to be alone with them." Tutter would like to be a grandfather and great uncle to his relatives.

Tutter feels bad about the incidents of sexual abuse that he remembers and states that he has changed. Tutter does not believe he has ever harmed Michelle sexually and supposes that he has harmed his ten-year-old niece sexually. However, he denied harming her sexually in a prior deposition. He believes that his niece would tell a jury that he did not harm her sexually. Tutter denied harming his stepson and stepdaughter. He does not believe that he has ever been sexually attracted to children.

At the conclusion of the State's case, Tutter moved for directed verdict, arguing, "We do not believe that he's met – the State has met their burden of proof beyond a reasonable doubt." The motion was denied, and the jury found that Tutter is a sexually violent predator beyond a reasonable doubt, after which the trial court entered a judgment and order civilly committing Tutter pursuant to the SVP Act. This appeal followed.

Analysis

To establish that an individual is an SVP, the State must prove that the individual: "(1) is a repeat sexually violent offender; and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." *Id*. § 841.003(a). Tutter's sole issue on appeal challenges the legal sufficiency of the evidence regarding the second element, regarding which the SVP statute defines "[b]ehavioral abnormality" as "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person."

"When conducting a legal sufficiency review of a determination that an individual is a sexually violent predator, we use the same legal sufficiency standard applied in criminal cases." *In re Commitment of Poltorak*, No. 09-22-00278-CV, 2023 Tex. App. LEXIS 4662, at *23 (Tex. App.—Beaumont June 29, 2023, no pet.) (mem. op.). This begins by acknowledging that the jury is the exclusive judge of the credibility of the evidence and the weight to be given to that evidence. *See Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). As such, the jury is responsible for resolving conflicts in the testimony, is free to believe some, all or

17

none of a witness's testimony, and may assign as much or as little weight to a witness's testimony as it sees fit. *Id.*

On appeal, we do not assess the credibility of the evidence, reweigh the evidence, nor substitute our judgment for that of the jury. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Rather, "we examine all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find the elements required for civil commitment as a sexually violent predator beyond a reasonable doubt." *Poltorak*, 2023 Tex. App. LEXIS 4662, at *23. While we cannot ignore undisputed facts that are contrary to the finding, we disregard "disputed evidence that a reasonable factfinder could not have credited in favor of the finding[.]" *In re Stoddard*, 619 S.W.3d 665, 676 (Tex. 2020) (emphasis omitted). The evidence is legally sufficient to support the finding if any rational trier of fact could have found each of the statutory elements beyond a reasonable doubt. *Id.*

Although couched in terms of a legal sufficiency challenge, Tutter's arguments on appeal attack the reliability of Arambula's opinions. Specifically, Tutter argues Arambula failed to mention or assign weight to several protective factors in Tutter's favor, and had he done so, the protective factors would have outweighed the aggravating factors. According to Tutter, these protective factors include (1) no male victim, (2) no unrelated victim, (3) no stranger victim, (4) no

18

noncontact sexual offenses, (5) less than four prior sentencing events, (6) no nonsexual violent convictions, (7) misplacement on denial and minimization, (8) Tutter's age, (9) a low Static-99R score, (10) a score of twenty on the PCL-R, and (11) no diagnoses of a major mental-health illness.

"We have consistently applied the rule that a timely objection must be made to preserve a claim challenging the reliability of an expert's testimony on appeal." *In re Dodson*, 434 S.W.3d 742, 750 (Tex. App.—Beaumont 2014, pet. denied); *see* Tex. R. App. P. 33.1(a)(2). Tutter did not object to Arambula's opinions before trial or during trial when the opinions were offered, and although he moved for directed verdict, the motion was insufficient to preserve the reliability complaints he makes on appeal. *In re Commitment of Serna*, No. 09-10-00029-CV, 2011 Tex. App. LEXIS 2371, at *8 (Tex. App.—Beaumont Mar. 31, 2011, no pet.) (mem. op.).

In the absence of a timely objection, we may still review whether the expert's testimony is legally insufficient to support a verdict, but we are limited to determining whether the expert's opinions are speculative or conclusory on their face. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 817 (Tex. 2009). A legal sufficiency challenge does not enable us to review for the first time on appeal "the underlying methodology, technique, or foundational data used by the expert." *Id.* (quoting *Coastal Transp. Co. v. Crown Cent. Petro. Corp.*, 136 S.W.3d 227, 233

(Tex. 2004)). Such objections must be made in the trial court so that the party offering the expert's testimony has an opportunity to cure any perceived defects, and so that the trial court may fulfill its role as gatekeeper. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex. 1998). The Texas Supreme Court has explained,

> When a scientific opinion is admitted in evidence without objection, it may be considered probative evidence even if the basis for the opinion is unreliable. But if no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection. "[A] claim will not stand or fall on the mere *ipse dixit* of a credentialed witness."

*Pollock*, 284 S.W.3d at 818 (Tex. 2009) (quoting *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999)). The record reveals Arambula explained the basis for his opinions, testifying at length about risk factors that have been identified in statistical studies – risk factors that in Arambula's opinion Tutter possesses – which increase a person's likelihood of recidivism. Tutter does not assert Arambula's opinions were conclusory or "mere *ipse dixit*." Nor does Tutter claim a person's risk of recidivism cannot be determined by an assessment of the person's risk factors. Rather, he argues Arambula's evaluation of Tutter's risk factors was flawed because he should have considered and assigned weight to several other factors which Tutter claims mitigate against the risk of recidivism. In other words, Tutter challenges Arambula's methodology, technique or foundational data. Since Tutter did not timely object to

20

Arambula's testimony on these grounds in the trial court, Tutter's complaints on appeal about the reliability of Arambula's opinions were not preserved for our review, even in the context of a legal sufficiency challenge. *Id*.

Having reviewed the record, we conclude Arambula's testimony was not, on its face, conclusory or mere *ipse dixit*, because he supported his opinions by explaining their bases. Therefore, Arambula's opinions may be considered as probative evidence that Tutter has a behavioral abnormality that predisposes him to commit a sexually violent offense. Tutter's arguments to the contrary are based on his own evaluation of the risk factors, as well as alleged protective factors that Tutter asserts, for the first time on appeal, should have been considered. Even if the factors listed in Tutter's brief weigh against the risk that he might reoffend, it was the jury's role to determine the credibility of Arambula's testimony and the weight to be given to his opinions. *See Stoddard*, 619 S.W.3d at 668. And although Tutter denied having some of the risk factors upon which Arambula's testimony was based, the jury was free to believe the State's evidence and disbelieve Tutter, and we may not substitute our judgment for that of the jury. *Id*. at 677.

Viewing the evidence in the light most favorable to the verdict, we conclude the jury's finding is supported by legally sufficient evidence because the jury could have reasonably concluded beyond a reasonable doubt that Tutter has a behavioral

abnormality that makes him likely to reoffend. We overrule Tutter's sole issue and affirm the trial court's judgment and order of commitment.

AFFIRMED.

KENT CHAMBERS
Justice

Submitted on March 3, 2025
Opinion Delivered August 14, 2025

Before Golemon, C.J., Wright and Chambers, JJ.